Argued 10 June; decided 1 July, 1901.

## STATE *v.* McDANIEL.

[65 Pac. 520.]

QUALIFICATION OF JURORS—OPINION.

1. A juror is not incompetent to sit on a case because he has heard and read about it, and has expressed an opinion, but has since concluded that he does not know the facts, and has strong impressions, which would require some evidence to modify, yet on the whole believes he can decide the case fairly on the testimony.

CRIMINAL LAW—PAPERS FOUND ON THE DEFENDANT.

2. Articles found on the person of a prisoner when arrested, if otherwise admissible in evidence, are not incompetent because taken from him by the public authorities—such use of such articles is not a compelling the defendant to give

39 OR.—11.

| 39 | 161 |
| 39 | 485 |
| 39 | 161 |
| 41 | 300 |
| 39 | 161 |
| e43 | 34 |
| 43 | 62 |
| 43 | 216 |
| 39 | 161 |
| 45 | 353 |
| 39 | 161 |
| f46 | 42 |
| 46 | 221 |
| 46 | 489 |
| 47 | 285 |
| 47 | 603n |

evidence against himself* or a violation of the constitutional guaranties against unreasonable searches.†

LETTERS—SUFFICIENCY OF IDENTIFICATION.

3.   At 8 o'clock on the evening of July 20, in the latitude of the State of Oregon, a witness who was in the second story of a cottage some twenty-five feet from the sidewalk, saw two persons passing on the walk, one of them reading a letter having a prominent printed heading, and such witness testified that a letter found on the person of the defendant when he was arrested some thirty-six hours later was to the best of her knowledge the same letter. *Held*, that the paper was sufficiently identified to be admissible in evidence as a means of fixing the identity of the prisoner and the person who was seen with the letter.

USE OF PAPERS ADMITTED IN EVIDENCE.

4.   An exhibit that has been received in evidence may be examined, and, if it be a document, may be read, by the jury.

ADMISSIBILITY OF PREJUDICIAL EXHIBITS.

5.   Being otherwise competent, the fact that the contents of a letter may tend to affect the character or reputation of the party against whom it is offered in evidence, or to prejudice him before the jury, is not a valid objection to its being admitted.

ADMISSIBILITY OF VOLUNTARY STATEMENTS BY ACCUSED.

6.   Statements made by a prisoner voluntarily, and not in pursuance of threats or promises by those in authority, are competent testimony against him.

---

*NOTE.—COMPELLING ACCUSED TO GIVE EVIDENCE AGAINST HIMSELF.— The practice of obliging an accused person to answer a series of cross-questions framed on the hypothesis of his guilt is considered a violation of the constitutional right not to be obliged to testify against one's self: *People* v. *Mullings*, 17 Am. St. Rep. 230.  See, also, as to the Cross-Examination of a Defendant in a Criminal Prosecution, *State* v. *Duncan*, 38 Am. St. Rep. 888, 895 ; *State* v. *Tice*, 15 L. R. A. 669, 674 ; *Ex parte Senior*, 32 L. R. A. 133 ; and *State* v. *Pancoast*, 35 L. R. A. 518.

*Levy* v. *Superior Court of San Francisco*, 29 L. R. A. 811, has a note on the Constitutional Protection Against Being Obliged to Furnish Evidence to be Used Against One's Self, in subdivision 1 of which is considered the question of Protection Against Self-Accusation.  *State* v. *Griswold*, 33 L. R. A. 227, was a case where the state introduced a package forcibly taken from the defendant's room, and it was held that he was not thereby compelled to give evidence against himself; and in *People* v. *Gardner*, 43 Am. St. Rep. 741, 28 L. R. A. 669, the court decided that by requiring a defendant to stand up in court so that a witness might see him, such defendant was not made a witness against himself.

†CONSTITUTIONAL PROTECTION AGAINST SEARCHES AND SEIZURES.—As to what is an unreasonable search of the house, papers, and effects of an accused person, see the following cases: *State* v. *Griswold*, 33 L. R. A. 227 ; *Williams* v. *State*, 39 L. R. A. 269 ; *State* v. *Davis*, 32 Am. St. Rep. 640, with note, Right to Protection of Books and Papers from Examination ; *Lester* v. *People*, 41 Am. St. Rep. 375, with note, Power to Compel a Party to Produce Books and Papers as Evidence or for the Examination of his Adversary ; *Newberry* v. *Carpenter*, 61 Am. St. Rep. 346, 31 L. R. A. 163 ; *Levy* v. *Superior Court of San Francisco*, 29 L. R. A. 811, with note on Unreasonable Searches and Seizures.

On the right of an officer to search a person arrested, and to seize and use as evidence any article thus discovered, see *Ex parte Hurn*, 25 Am. St. Rep. 23, 18 L. R. A. 120 ; *Rusher* v. *State*, 47 Am. St. Rep. 175 ; *Pickett* v. *State*, 59 Am. St. Rep. 226.—REPORTER.

EVIDENCE OF OTHER CRIMES.*

7. Where evidence tends to connect the defendant with the commission of the crime charged against him, or is so connected therewith as to be a part of it, such evidence is admissible, though it may also tend to show that defendant has committed other offenses as well as the one which is under investigation: *State* v. *Baker*, 23 Or. 441, applied. For example, where the body of an unmarried young woman was found in a secluded spot, and it was evident that an attempt had been made to produce an abortion on her, and defendant, who was indicted for her murder, was the last person seen with her, and it appeared that a few days previously he had sought some means of producing an abortion, a statement of defendant to the officers, that he had been physically intimate with the deceased, was so closely connected with the crime charged as to render it admissible, though it be considered as amounting to a confession of a different offense.

SUFFICIENCY OF IDENTIFICATION OF HANDWRITING.

8. Evidence of two witnesses that they knew the defendant's handwriting, and that they believed a certain letter was written by defendant, and evidence that while defendant was in jail a copy of the letter was read to him, and he admitted having written the original, was sufficient to show the letter was written by defendant, and to render it admissible against him.

RIGHT TO CONTRADICT ONE'S OWN WITNESS.

9. Where a witness testifies on a material point at the trial otherwise than he has previously done in the same case, or than he has stated his testimony would be, to the prejudice of the party calling him, such party may show previous statements contradictory of his testimony, in explanation of his having been called, though the rule may be otherwise where the witness simply fails to testify as fully or strongly as expected. The difference is between negative testimony and affirmatively contradictory testimony: *State* v. *Steeves*, 29 Or. 85, cited. The fact that the party calling the witness may have had cause to anticipate his changed position does not alter the application of the rule.

IMPROPER REMARKS BY COURT—CURING ERROR.

10. A presiding judge is entitled to use such language during a trial as will make clear the point of his rulings, and an appellate court will hesitate to construe statements so used as an expression of opinion on a fact, and if such an error does appear, a subsequent prompt direction to disregard the objectionable words operates to render the error harmless.

COMPETENCY OF EXPLANATORY EVIDENCE.

11. After the violent death of a young woman a letter addressed to her and shown to have been written by the defendant was found in her room, which stated that the defendant wished to see the deceased, and that he could hardly wait until Saturday before seeing her. Defendant had been constantly and conspicuously attentive to the dead girl. *Held*, that testimony of the mother that she and the dead girl's sister intended to be absent from home Saturday, and that deceased knew that fact, was admissible as explanatory of the intimation in defendant's letter that he and deceased had an appointment for Saturday, and as showing a reason for their selecting that day.

IMPROPER REMARKS OF COUNSEL—CURING ERROR.

12. Where, during the argument as to the admissibility of testimony, the state's attorney asked in what way the testimony proved that the defendant did

---

*NOTE.—On this point see the authorities collected in the case of *State* v. *Pancoast*, 35 L. R. A. at pp. 521 and 527.—REPORTER.

not strangle the deceased, a statement by the court that it was unnecessary to use such language, and an instruction that the jury should disregard the remark, cured any error.

IDEM.

13.   Where the state's attorney remarked that the witness was antagonistic to the state, and had been talking with defendant's attorneys, a ruling of the court that the jury were the judges whether the testimony of the witness was for or against the state, and that the other remarks should be disregarded, and that it was no objection if the witness had been talking with the attorneys, and a subsequent instruction to disregard any remarks of counsel not based on the evidence, cured any error.

CONTRADICTING AND IMPEACHING ONE'S OWN WITNESS.

14.   Under Section 838 of Hill's Ann. Laws, providing that the party producing a witness may contradict him by statements made at other times inconsistent with his present testimony, where the state claimed that the defendant killed the deceased because of his fear of her father in case he should discover that the deceased was pregnant, and a witness testified that shortly before the homicide the defendant stated to witness that the father was "a savage old bulldog," it was competent to ask the witness if he had not previously stated at a given time and place, and in the presence of certain named persons, that defendant also said in the same conversation that he was afraid to go with the deceased girl on that account, since the difference between the two statements was material and adverse to the prosecution.

15.   Testimony of an officer of the fire department that the fire bell did not ring on a certain night before 12 o'clock, and that he based his knowledge on the fact that the automatic indicator of the department did not register a ringing of the bell, was competent, though not based on the personal knowledge of the witness : *Willis* v. *Lance*, 28 Or. 371, cited.

TRIAL—WHEN OBJECTIONS TO TESTIMONY SHOULD BE MADE.

16.   Where a party neither objects to evidence when it is offered, nor moves to strike it out, objections thereto are waived, and a request to direct the jury to disregard it may properly be refused : *First Nat. Bank* v, *Home Ins. Co.* 33 Or. at p. 237, cited.

COMPETENT EVIDENCE EXCLUDING OTHER HYPOTHESES.

17.   Where it was material to show the time when a man returned to his lodgings on a certain occasion, and it had already appeared that the only other men staying in the house were in bed before a stated hour, evidence that a man was seen to enter that house after that time was competent, as tending to prove that such person was the defendant.

TRIAL—CORRECTING RULING—HARMLESS ERROR.

18.   Where one of defendant's witnesses was required to answer, on cross-examination, whether he had not been convicted of drunkenness, an instruction that the jury should disregard evidence as to such conviction rendered the error harmless.

COMPETENT IMPEACHING TESTIMONY.

19.   Defendant roomed at M.'s house, and M. testified that he heard defendant come home on the night of the homicide at 11:30, and that he heard his footsteps on the stairs.   A member of the grand jury testified that M. swore before that body that he heard a squeaking noise on the steps during the night, but did not know what it was, and on cross-examination the juror stated that he was not sure that the jury asked M. the specific question whether he heard defendant go

upstairs, but that they questioned him particularly to find out if he knew when defendant came home, and from his general testimony found that he did not know. *Held,* that a motion to strike out the juror's testimony, as based on conclusions, was properly overruled, as it can not fairly be said that the witness was testifying to a conclusion.

REFUSING TO GIVE DUPLICATE INSTRUCTIONS.

20. Where all the requested instructions which were pertinent to the case were embodied in the charge prepared by the judge, it was proper to deny the request.

NEW TRIAL FOR MISCONDUCT OF JUROR—DISCRETION.

21. Disputed questions of fact in connection with a motion for a new trial on account of alleged misconduct of a juror must be determined by the trial court, and, as in other discretionary matters, the decision will be reviewed only for manifest error: *State* v. *Magers*, 36 Or. 38, applied.

TIME FOR FILING MOTION.

22. When a time is prescribed within which a motion is to be filed, it must be filed within that time or it may be disregarded.

From Multnomah : MELVIN C. GEORGE, Judge.

Frank E. McDaniel appealed from a judgment of manslaughter.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Henry St. Rayner.*

For the state there was a brief and an oral argument by *Messrs. D. R. N. Blackburn,* Attorney-General, *Geo. E. Chamberlain,* District Attorney, and *Russell E. Sewell.*

MR. CHIEF JUSTICE BEAN delivered the opinion.

On the afternoon of July 20, 1899, the body of Clara Fitch, a girl nineteen years of age, was found in a secluded and unfrequented portion of what was formerly Cycle Park, in Portland, but which had not been used as such for some time. It was almost, if not completely, covered with ferns and boughs, which had been gathered in the immediate vicinity. There were a number of lacerations and bruises or contusions on the face and right hand, which the physician who made the autopsy testified could be produced only by violence, and in his

opinion were caused by a human hand, either that of an assailant or of the deceased in attempting to remove the hand of another. The womb was lacerated, torn, and jagged, evidently caused by the use of some mechanical appliance, and the clothing under the body was wet with urine mingled with blood. The evidence tended to show that death was caused by homicidal strangulation or suffocation. The defendant was immediately arrested, and charged with the murder, and upon his trial convicted of manslaughter. He and the deceased were about the same age, and became acquainted while attending the high school, in 1898. She soon became very much infatuated with him, but her parents forbade their associating together. He, however, continued his attentions without their knowledge, meeting her secretly and clandestinely, until finally he seduced and became criminally intimate with her. About ten days before her death she informed him of facts which led him to believe, although mistakenly, as the autopsy subsequently showed, that she was pregnant. This information gave him great uneasiness and alarm, for fear her parents would ascertain her condition, and her father, whom he seemed to have regarded with especial dread, would kill him. A few days before her death he sought from a friend who had attended medical school, but was not a practicing physician, some means which would enable him to produce an abortion.

On the evening of the nineteenth of July he met the deceased by appointment about 7 :30 o'clock on East Burnside Street, and they walked out to Cycle Park, where they remained until near 10 o'clock in the evening, when they returned in the direction of Miss Fitch's home, at the corner of Irving Street and Grand Avenue, about a mile distant from the park. During this walk from Burnside Street to Cycle Park and back they were seen by several persons, but the last time either of them

was seen that night by any witness in the case, and the last time Miss Fitch was seen alive, was about 11 o'clock, at the corner of Sixth and Hoyt Streets. From this point the theories of the prosecution and of the defense diverges. The defense claims that the parties separated at that corner, and the defendant went directly to the residence of Mr. Morse, at the corner of Twelfth and Oak, and to bed with his roommate, Clay Morse, where he remained until morning. But the theory of the prosecution is that when defendant and deceased were in Cycle Park he attempted to produce an abortion by the use of some mechanical means, causing her great pain and suffering, which, in connection with her feeble and delicate condition, made her extremely nervous and excitable ; that, such nervousness being still apparent when they reached Sixth and Hoyt Streets, he was afraid to let her go home, because he knew her mother would scold her for being out so late, and in her then nervous condition she would probably disclose the true state of affairs, and thus his conduct become known to her parents, and his life be endangered. He therefore persuaded her to return to the park to remain until morning, suggesting that she could tell her mother that she had spent the night with a friend ; but her condition becoming no better, and the fear of exposure being imminent, he concluded, as a last resort, to entice her to a secluded place, take her life, and conceal the body, thus hoping to escape detection. There was much evidence bearing more or less directly upon these two theories, but, it is unnecessary to state it in detail, as it presented questions for the jury, and not the court. With this statement of the general facts and the theories upon which the case was tried, we will proceed to an examination of the specific errors assigned.

1.   It is insisted that the court erred in overruling the challenges for cause to the jurors Keenan and Kronenberg.   Keenan testified, in substance, that he read what purported to be the facts in the case in the newspapers soon after the body was found ; that he had heard the matter talked about by a great many parties, and had formed and expressed an opinion, but did not have such opinion at the time of his examination ; that he first heard one thing, then another, and finally came to the conclusion that he did not know anything about it ; that he did not hear or read enough to form a fixed opinion, although the opinion or impression he had would require some evidence to change it ; that he could not dispossess himself of the opinion he then entertained unless evidence was introduced to cause him to do so, but whatever opinion he may have previously formed would not interfere in any way with the determination of the case.   Kronenberg said that he heard of the affair about the time it occurred, but he did not form or express any opinion as to the guilt or innocence of the defendant, but did form an opinion that a crime had been committed, which he still entertained, and which would take evidence to remove ; that he could not say it was a fixed and definite opinion, or that it was correct ; that he could disregard any opinion he had, and try the defendant fairly and impartially. Under the facts disclosed by the examination of these two jurors, there was clearly no reversible error in overruling the challenges.   We have so often had occasion to examine similar questions that it is unnecessary to do more at this time than refer to previous decisions : *State v. Saunders,* 14 Or. 300 (12 Pac. 441) ; *Kumli v. Southern Pac. Co.* 21 Or. 505 (28 Pac. 637) ; *State v. Brown,* 28 Or. 147 (41 Pac. 1042) ; *State v. Kelly,* 28 Or. 225 (52 Am. St. Rep. 777, 42 Pac. 217) ; *State v. Morse,* 35 Or. 462 (57 Pac. 631).

2.   The next assignment of error is based on the ruling
of the court in admitting in evidence a letter offered for
the purpose of identifying the defendant and deceased as
the couple seen by a Miss Rohr going out Twelfth Street
on the evening of July 19.   The letter was found upon
the person of defendant, and taken from him at the time
of his arrest.   The specific objections made to its admis-
sibility as evidence are (1) that its seizure was a viola-
tion of the constitutional guaranties against unreasonable
search,* and its production in court was in violation of
the provision that no person shall be compelled to give
evidence against himself * ;  and (2) that it was incompe-
tent and irrelevant.   The fact that the letter was taken
from the person of the defendant at the time of his arrest,
by the officer having him in charge, is no valid objection
to its admissibility in evidence if it is otherwise compe-
tent and pertinent to the issue :  1 Greenleaf, Ev. (15 ed.)
§ 254a.   In State v. Nordstrom, 7 Wash. 506 (35 Pac. 382),
it was sought to connect the defendant with a homicide
by means of certain boot and sock tracks impressed in
soft and muddy ground at the scene of the crime.   The
boots and socks of the defendant were taken from his
person upon his arrest, and retained by the sheriff, to be
used as evidence against him.   Objection to their intro-
duction was made on the ground that they were obtained
by an unreasonable search of the person, and that it

---

*NOTE.—The following constitutional provisions are here referred to:

*Constitution of the United States.*

Fourth Amendment: The right of the people to be secure in their persons,
houses, papers, and effects against unreasonable searches and seizures shall not
be violated, etc.

Fifth Amendment: No person * * * shall be compelled in any criminal
case to be a witness against himself, etc.

*Constitution of Oregon.*

Article I, § 9: No law shall violate the right of the people to be secure in their
persons, houses, papers, and effects against unreasonable search or seizure, etc.

Article I, § 12: No person shall * * * be compelled in any criminal prose-
cution to testify against himself.—REPORTER.

was, in effect, compelling the defendant to give evidence against himself. Neither of these objections was sustained by the court, however, and the evidence was held competent. In *Lovelace* v. *State*, 12 Lea, 721, a postal card found upon the person of the defendant, addressed to another party, was held competent evidence, though not proven to have been written by the defendant. And in *State* v. *Stair*, 87 Mo. 268 (56 Am. Rep. 449), it was held that a writing found in the possession of the defendant at the time of his arrest was competent evidence against him. *State* v. *Baker*, 33 W. Va. 319 (10 S. E. 639), was a prosecution for a homicide, wherein it was held competent for the state to give in evidence, over the prisoner's objections, pantaloons taken from his person by the officer when arrested, supplemented by evidence tending to show that an investigation by experts had revealed blood stains thereon. We think, therefore, it is no objection to the introduction of the letter in question that it was found upon the person of the defendant at the time of his arrest, and taken from him by the chief of police in making the search that is usually made of arrested persons.

3. Nor do we think it was incompetent or irrelevant. Miss Rohr testified that about ten minutes before 8 o'clock in the evening she was in the second story of her house, sitting in a window overlooking the sidewalk ; that she heard laughter, and looking out saw a young man and woman passing along the street. The young lady was reading a letter consisting of two or three sheets of paper, having a deep printed and prominent heading like a letter from a business house, and as the couple were opposite the window she heard the lady say, " What a funny thing for her to write !" She watched the couple until they reached the corner of the street, when the lady handed the letter to the young man, who inclosed it in an envelope

and put it in his pocket.   Upon being shown the letter referred to, the witness testified that the printing thereon resembled that upon the letter she saw the young lady reading, and to the best of her knowledge it was the same letter, but as she was about twenty-five feet from the sidewalk she could not say with certainty.   Now, one of the means of identifying the defendant and the deceased as the parties seen by Miss Rohr was the letter deceased was reading, which Miss Rohr testified was, to the best of her knowledge, the one offered in evidence.   Although she could not be positive that it was the same letter, yet there were marks of identity, common to both, sufficient to entitle it to be offered and admitted as testimony for the purpose intended, especially since counsel for defendant stated that if it was offered "merely for the purpose of identifying the fact that Miss Fitch had that in her hand, during the time she was in company with this boy, I don't think I have any objection, but I do object to its being read in evidence."   No effort was made by the state to prove by whom the letter was written, nor was anything claimed for it except as a means of identification, and for this purpose it was, in our opinion, competent.

4.   The letter having been properly admitted in evidence, the jury were entitled to inspect and read it, if they so desired.   Moreover, it was so connected with the conversation of the parties as to make it almost, if not quite, a part thereof, and necessary to explain the remark of the deceased concerning its contents.

5.   It is urged that it tended to blacken the character of the defendant, and to prejudice him before the jury. If this were true, it would afford no reason for its non-admission if otherwise competent; but we are not pre-

pared to say, with counsel for the defendant, that of itself it would have such an effect, and no extraneous testimony was given or offered concerning it, except the statement made by the defendant to the chief of police that it was written by a married woman.

6.   The next contention is that the court erred in admitting in evidence certain declarations made by the defendant to the chief of police, soon after his arrest, concerning his illicit intimacy with the deceased.   It is elementary law that the confessions or statements made by a prisoner to an officer having him in custody on a charge of crime are inadmissible against him, when induced by the influence of hope or fear (*State* v. *Wintzingerode*, 9 Or. 153 ; *State* v. *Moran*, 15 Or. 262, 14 Pac. 419); but the evidence clearly shows that the alleged statements of the defendant do not come within this rule.   The chief of police testified that when brought to his office, a few hours after the body of Miss Fitch was discovered, he was informed, before he made any statements whatever, that he did not have to talk or answer any questions unless he wanted to, but he was not only willing, but anxious, to make a statement in reference to his connection with the matter, and that no hope was held out to him, or promises made that it would be to his advantage to make such statement, nor was there any attempt to extort it by threats.   Whatever statement he made was manifestly his voluntary act, uninfluenced by any acts or threats of the officers, and was therefore competent testimony :  *Sparf* v. *United States*, 156 U. S. 51 (15 Sup. Ct. 273);  Underhill, Cr. Ev. § 129.

7.   It is argued, however, that the statements related to collateral matters, and amounted to confessions of guilt of other offenses than that alleged in the indictment.   The

general rule is unquestioned that evidence of a distinct crime, unconnected with that alleged in the indictment, can not be given against a party on trial; but where the evidence offered logically forms a link in a chain of circumstances tending to connect the defendant with the commission of the crime charged in the indictment, or is so connected therewith as to form one entire transaction, it is admissible, although it may tend to prove other offenses: *State* v. *Baker*, 23 Or. 441 (32 Pac. 161). And under this rule the declarations of the defendant concerning his association with, and relationship to, the deceased, were undoubtedly competent and material testimony.

8.   Two or three days after the death of Miss Fitch her mother found a letter in her room, of which the following is a copy:

"*My Darling Claire:*

"I have thought so much about you in the last twenty-four hours that I have to hear from you some way, or I believe I would go crazy.  I can't imagine what I was thinking about when I told you I could wait until Saturday to hear from you.  I haven't done anything to-day but think and think.  Last night I laid awake, and wondered if you were awake, too; what you were thinking about; and, most of all, what you thought of me.  Claire, if I thought you didn't care anything for me, I wouldn't care what became of me.  I have been worrying all night and all day about what you told me yesterday.  It is dangerous to let yourself go that way so long.  O, I wish I could see you and talk to you, and understand things better.  And I have so many things to tell you,—things which you must know, and I know there is no one else to tell you.  I walked up and down Grand Avenue for an hour and a half to-night in hopes of seeing you, but failed entirely, and came home almost worried to death.  For my sake, Claire, be careful what you do now, at least until I have had a good talk with you; and be careful of your folks.  Mothers generally are very careful, and

it would almost kill me if I should get you in any trouble of this kind. Keep your own council, and confide in no one until you see me. If you are in trouble, you can always find me at 543 Oak at night, and in daytime telephone to Main 719, and ask for 'Clay,' and if he isn't there leave word for me,—worded of course, so I can understand it and no one else. Don't be afraid to send for me at any time if you need me. Answer this as soon as possible, please, and tell me everything, and, if you can possibly, let me see you, even for a few minutes, Wednesday or Thursday. With all my love.

"Yours, forever,

"[Signed]        FRANK."

The state, contending that this letter was written by the defendant, offered it in evidence, and it was admitted over his objection and exception. It is insisted that the court erred in this respect, because there was no proof that it was written by the defendant. But we think the testimony sufficient upon this point. The witnesses Brandes and Clay Morse both testified that they knew his handwriting, and believed the letter to have been written by him, and the witness Day testified that while the defendant was in jail he was shown a copy of the letter, and after reading it over said that he had written the original. This was sufficient proof of its authenticity to entitle it to be admitted in evidence.

9. Clay Morse, a witness for the prosecution, testified that he was acquainted with the defendant and Miss Fitch; that they attended the high school, where they became acquainted; that defendant had been keeping company with her off and on since that time; that witness had carried notes from him to her several times, and defendant had often talked to him about their intimacy, her supposed condition, and his fears on account thereof; that defendant went to work for witness' father about the

middle of April, since which time he had lived at their
house and roomed with witness; that witness was at
home the night of July 19, and found the defendant in
bed with him the next morning, about 6 o'clock, when
they were called to breakfast, but did not know when
he came in; and that he was sure he did not have a con-
versation with the defendant that morning. He was then
asked by counsel for the state if prior to that time he had
not made a statement to the effect that he did have a con-
versation with the defendant in the morning. Objection
was made, and the court ruled that the question was in-
competent if intended for the purpose of impeachment;
whereupon the state disclaimed such purpose, and the
objection was overruled. Witness was then shown a
paper signed by him, purporting to be his testimony when
examined as a witness by the district attorney under the.
information law, and asked if he did not at that time,
while under oath, make the following statement: "I
awoke in the morning about 6 o'clock, and found Mc-
Daniel in bed with me. I started to dress myself. He
said to me, ' Did you hear me come to bed last night?'
I said, ' No.' He then said, ' Well, don't tell any one
about it; keep still about it.' I said I wouldn't say any-
thing about it." Objection was made to this question on
the ground that it was an attempt on the part of the
state to lay a foundation for the impeachment of its
own witness, which was overruled, and the witness an-
swered that he did make such a statement, but that the
district attorney, his deputy, the chief of police, some
detectives, and other gentlemen were present, and all
talking to him at the same time, and "they had me
pretty well rattled, and I was scared." It is argued
that this question, and the evidence sought to be elicited
thereby, were incompetent, because the witness had sim-
ply denied having any conversation with the defendant

at the time referred to, and that a party can not impeach
his own witness on account of mere negative testimony.
As a general rule, this may be conceded (*State* v. *Steeves*,
29 Or. 85, 98, 43 Pac. 947); but the testimony of the
witness was contradictory of that previously given in be-
half of the state. The chief of police testified that at
the time of defendant's arrest he voluntarily stated that
the next morning after the disappearance of Miss Fitch
he had a conversation with the witness Morse, in which
reference was made to the time he came home the night
before. The testimony of the witness was therefore
material and prejudicial to the state, and, under Section
838 of Hill's Ann. Laws,* it had a right to lay the foun-
dation for his impeachment by the inquiry as to whether
he had at other times made statements inconsistent with
his testimony at the trial. It is contended, however,
that the state was not surprised by the testimony of the
witness, because he had given similar testimony before
a coroner's jury. The witness had previously testified
before the district attorney, and again before the coro-
ner's jury, and upon this point his testimony was incon-
sistent and contradictory, and we do not think the state
should be denied the right to show that the witness had
made statements out of court inconsistent with his testi-
mony therein, on account of evidence he may have given
before the coroner.

---

*Sec. 838. The party producing a witness is not allowed to impeach his credit
by evidence of bad character, but he may contradict him by other evidence, and
may also show that he has made at other times statements inconsistent with his
present testimony, as provided in section 841.

Sec. 841. A witness may also be impeached by evidence that he has made, at
other times, statements inconsistent with his present testimony; but before this
can be done, the statements must be related to him, with the circumstances of
times, places, and persons present; and he shall be asked whether he has made
such statements, and if so, allowed to explain them. If the statements be in
writing, they shall be shown to the witness before any question is put to him
concerning them.

Objection was also made to the attempt of the state to impeach the witness on account of contradictory statements he made in reference to the date when the letter offered and admitted in evidence was written by the defendant. But what we have already said disposes of that objection.

10. In ruling upon objections made to the introduction of testimony, and while the witness Morse was on the stand, the court stated, in the presence of the jury : "This witness is the personal friend of the defendant;" that they roomed and slept together ; and that defendant was in the service of the witness' father, and "the presumption would be, as far as that goes, that he is friendly to the defendant in this case." Exception was taken to the remarks of the court in intimating that the witness was antagonistic to the state. The court thereupon remarked : "The court has not said the witness was antagonistic to the state, but simply said he was a roommate of the defendant, and that the defendant was in the employ of the father of the witness. The jury may draw whatever inference they may see fit." Thereafter, during the cross-examination of the witness, the court, addressing defendant's attorney, said : "This witness has shown that he should not be asked leading questions, even on cross-examination. That is subject to the discretion of the court, and the court thinks that this witness is so favorable to your side that leading questions need not be put." Exception was taken to the remark that the witness is "favorable to our side," whereupon the court said : "Very well. The court does not exactly understand whether you are excepting to the ruling, or some statement that the court made." Counsel for the defendant : "I am excepting to the statement in the

ruling that this witness is favorable to the defense.''
The court: '' So far as any statement of fact is con-
cerned, the court will withdraw any remark as to the
fact concerning this witness, and the jury will disregard
any remark of the court as having nothing to do with the
case. The court simply rules that the counsel for defend-
ant in this case ought not to ask questions that suggest
answers to this witness.'' It is argued that these com-
ments of the court in reference to the witness constitute
an invasion of the province of the jury, and are preju-
dicial error. It is universally conceded that under our·
system the jury are the exclusive judges of the credibility
of the witness, and it is error for the court to assume to
determine that question : *State* v. *Lucas*, 24 Or. 168 (33
Pac. 538, 666). The remarks of the court, however, were
not made to the jury, but in passing upon the competency
of evidence. In such a case the court has a right to use
such language as is necessary to make its ruling under-
stood, and in this case any error that may have been
committed was, in our opinion, cured by the subsequent
withdrawal of the objectionable words, and the instruc-
tion to the jury to disregard them : *Reinhold* v. *State*, 130
Ind. 467 (30 N. E. 606); *Ryan* v. *State*, 83 Wis. 486 (53
N. W. 836); *Commonwealth* v. *Ward*, 157 Mass. 482 (32
N. E. 663); *People* v. *Northey*, 77 Cal. 618 (19 Pac. 865, 20
Pac. 129). Nothing is claimed for the statement that the
defendant ought not to be permitted to ask witness lead-
ing questions on cross-examination, and the record shows
that he was permitted to cross-examine the witness at very
great length, and to ask leading questions. If, therefore,
it be conceded that the language used by the court in refer-
ence to the witness reflected upon his credibility, and was
improper, the remark became harmless by reason of the
subsequent action of the court in withdrawing the objec-
tionable words. As soon as its attention was called to

the matter, and to counsel's position in reference thereto, it very promptly endeavored to correct any erroneous impression the jury may have received therefrom.  Moreover, it appears that full instructions were given upon this point, and the jury were undoubtedly made to understand that they were not to be influenced by any remarks of the court in reference to the facts of the case or the credibility of witnesses, and that they were the sole judges in matters of that kind.

11.   It is next urged that the court erred in permitting Mrs. Fitch, the mother of the deceased, to testify that she and her daughter Agnes intended to be absent from home the Saturday following the seventeenth of July, and that her daughter Clara was informed of that fact.   This evidence was offered and admitted as explanatory of the intimation in the letter alleged to have been written by defendant to the deceased, a few days before her death, that they had made an appointment for Saturday, and as a reason for their selecting that day, and was, we think, competent.

12.   During the cross-examination of the witness Necritz she was asked if, when examined by the district attorney, she was sworn not to disclose what occurred or to repeat her statements to any one else.   Objection was made to the question on the ground that it was not proper cross-examination and incompetent, during the argument on which the deputy district attorney made use of the following language :  "In what way does this disprove the fact that McDaniel strangled this girl?   I think it is pettifogging of the worst kind."   Objection was made to this remark, and the court thereupon said, "There is no need to use such language."   While the remark of counsel may have been ill advised, it does not appear to have

been made for the purpose of prejudicing the jury against the defendant, and the observation of the court in reference thereto had the effect of a direction to the jury to disregard it, and at the proper time they were expressly so instructed.

13. This witness testified that she was in Holladay Park the evening of July 19, and saw defendant and the deceased returning towards home, and said that they seemed happy. On redirect examination, she was asked, "What you mean by being 'happy' was that they were interested in each other?" Objection was made thereto as being leading, whereupon the deputy district attorney said to the court: "She is a reluctant witness, and your honor can see that she has been talking with counsel. She is somewhat antagonistic to the state. It is for your honor to pass upon whether I can put leading questions to a witness who appears a little adverse to the interests of the state, and in the face of the fact that she has been talking with counsel for the defendant in this case." Exception was taken to the statement that witness was antagonistic to the state, and that she had been talking with defendant's counsel, whereupon the court ruled: "The jury will be the judge as to whether the testimony is for or against the state, as far as this witness is concerned. The other statements of counsel should be disregarded. Even if she has been talking with the attorneys, it is no objection." This ruling, together with the subsequent instruction to the jury that they should disregard any remarks of counsel for the state not based on evidence, rendered harmless the language used by the deputy district attorney, if it was otherwise improper.

14. One Chris Luft was called as a witness for the state, and testified, among other things, that some time

between the first and tenth of June, 1899, he had a con-
versation with defendant about Miss Fitch and her people,
and asked him what kind of a man Mr. Fitch was, to
which he answered, "I think he is a pretty savage old
bulldog." Witness was then shown an affidavit, signed
by him in the office of the district attorney, and asked if
he did not at the time the affidavit was made, and in the
presence of the parties there assembled (naming them),
say, in addition to what he had already testified to on
the trial in reference to Mr. Fitch, that defendant said
"he was afraid to go with her on that account." Objec-
tion was made to the question on the ground that it was
an attempt by the state to contradict and impeach its
own witness. As we have already said, the state is en-
titled, under the statute, to show that a witness called
by it has made statements out of court inconsistent with
his present testimony, and, under this rule, the evidence
objected to was manifestly competent. The testimony
upon this point was material, according to the state's
theory of the case, and therefore the denial of the witness
that defendant said he was afraid to go with deceased on
account of her parents was adverse to the state, and it
clearly had a right to call the witness' attention to his
previous statements in reference to the matter, not only
for the purpose of refreshing his memory, but in order
to lay the foundation for his subsequent impeachment,
should it be deemed necessary.

15. Mr. Milton Weidler, Secretary of the Portland
Fire Department, whose duty it is to keep the record of
the fire alarms, was called as a witness for the prosecu-
tion, and testified that the fire bell did not ring on the
evening of July 19 up to 12 o'clock midnight; that he
based his knowledge upon the fact that the city keeps a
register and system of electric apparatus by which every

fire alarm is automatically indicated in the office, under which it is impossible for an alarm to be rung without a record being made of it, and thus coming to the knowledge of the witness. Objection was made to the introduction of this testimony, on the ground that the witness was not speaking from personal knowledge, but from that derived from the record of the department. As we understand the law, however, such evidence is competent: *Willis* v. *Lance*, 28 Or. 371 (43 Pac. 384, 487); *Knott* v. *Raleigh, etc. R. R. Co.* 98 N. C. 73 (3 S. E. 735, 2 Am. St. Rep. 321).

16. Frank Kerslake testified that on the night of the nineteenth of July he saw some man go into the residence of Mr. Morse, where defendant lived, but that he could not recognize the party, and did not notice the direction from which he came, although he thought he came from the north; that it was either ten minutes to 12 or ten minutes after 12 o'clock. No objection was made to the admission of this testimony, nor motion to strike it out; but defendant requested the court to direct the jury to disregard it, and the refusal to give such instruction is assigned as error. "The authorities seem to be uniform," says Mr. Justice WOLVERTON, in *First Nat. Bank* v. *Home Ins. Co.* 33 Or. 234, 237 (52 Pac. 1055), "that a party who has permitted incompetent or irrelevant testimony to go to the jury without seasonable objection will not be entitled as of right to have it withdrawn by instructions when the case is ripe for the jury." So that, if the testimony of Kerslake was in fact incompetent and irrelevant, the defendant waived his right to have it stricken out by not making seasonable objection.

17. It seems to us, however, that the testimony was competent and material, for the reason that it was shown

that the only men who were staying at the Morse residence on the night of the nineteenth of July were A. P. Morse, his son Clay, and the defendant.    It was further shown that Mr. Morse and his son were both in the house, and had retired long prior to the time Kerslake asserted he saw some one go in, and hence the evidence was competent as tending to establish the time at which the defendant returned home.

18.    One Nathan Coffman, a witness for the defense, was asked, upon cross-examination, if he had not at a certain time been convicted of drunkenness, and, over the objection of the defendant, was permitted to answer. Subsequently the court, upon reflection, reversed its ruling upon this point, and instructed the jury to disregard any evidence in reference to the witness having been convicted of drunkenness.    The admission of such testimony was thus rendered harmless, even if it was erroneous in the first instance.

19.    A. P. Morse, a witness for the defendant, gave evidence to the effect that he heard defendant come home on the night of the nineteenth at about 11:30 ; that he heard his footsteps on the stairs, and heard him go into his room and shut the door.    On cross-examination he was asked several impeaching questions regarding this testimony, and the statements he had made before the grand jury in reference to the matter.    Thereafter, on rebuttal, S. M. Mears, a member of the grand jury, was called, and testified, on his direct examination, that Morse stated before the grand jury that he did not hear the defendant come into the house that night ;  that he (Morse) went to bed about 9 o'clock, and to sleep immediately ; that he woke up once during the night, and heard a squeaking noise on the front steps, but did not know what  ·

it was, and went to sleep again, and did not wake up until 5 o'clock in the morning. On cross-examination he was asked if Morse said he heard defendant come upstairs, and answered that he was not sure that specific question was asked Morse, but that the grand jury questioned him particularly to find out whether he knew when defendant came into the house, and, from his general testimony, "we found out that he didn't know." Counsel for defendant thereupon moved to strike out the testimony of the witness on the ground that he had testified as to his conclusions rather than to specific statements of the witness Morse before the grand jury. But this is not, in our opinion, a proper interpretation of the testimony of the witness, and the motion was properly overruled.

20. At the proper time counsel for defendant requested the court to give the jury certain instructions, numbered one to twenty-nine, inclusive, all of which were refused, except as embodied in the general charge. An assignment of error is based upon the refusal to give each of the instructions so requested, but it is unnecessary to consider them in detail, because an examination of the general charge of the court discloses the fact that all the instructions requested by the defendant which were pertinent to the case were covered by and embodied in the general charge.

21. Within the proper time, a motion for a new trial was made, on the ground that one of the jurors had testified on his *voir dire* that he had no particular information about the case, and no fixed or settled opinion, when in truth and in fact he had repeatedly declared that defendant was guilty as charged, and, if not, he ought to be hung on general principles anyhow. The material parts of the affidavit upon which this motion is based were con-

tradicted by the juror, also by other parties, so that it presented a question of fact, and we are not disposed to disturb the findings of the trial court in reference thereto : *State* v. *Magers*, 36 Or. 38 (58 Pac. 892).   The record shows, and it is unquestioned, that whatever may be the fact in regard to the juror's previous statements or knowledge concerning the crime, and defendant's connection therewith, as a juror he was favorable to the defense, and stood for acquittal as against a verdict of murder in the first degree.

22.   After the time in which to file a motion for a new trial had expired, the defendant filed what is called a "supplemental motion," based on the alleged misconduct of the jury and bailiff in charge thereof.   But, as the motion came too late, it was, we think, properly disregarded by the trial court.

Having considered in detail all the assignments of error, we are agreed that the judgment of the court below should be affirmed, and it is so ordered.   AFFIRMED.