Argued and submitted November 3, 1982, reversed June 29, 1983

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# JERRY WALLACE DAVIS,
*Petitioner on Review.*

(CA A23060, SC 28881)

666 P2d 802

Phillip A. Lewis, Portland, argued the cause and filed the brief for petitioner on review.

Richard David Wasserman, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

CARSON, J.

Roberts, J., filed a concurring opinion.

Peterson, J., filed a dissenting and concurring opinion in which Campbell, J., joined.

## CARSON, J.

Defendant was convicted of Possession of a Controlled Substance and being an Exconvict in Possession of a Firearm. He seeks to suppress evidence obtained during a warrantless entry and search of his motel room and search of his person after arrest. This case presents for our consideration the permissible limits of police conduct undertaken upon at most a reasonable suspicion but without probable cause to believe that Defendant committed a crime.

Nine police officers responded to a report of a fight at a North Portland motel. The police found no fight when they arrived. Instead, they were approached by a man who said his girlfriend might be being raped in room number nine by a man he had seen with an automatic pistol in his waistband. With guns drawn, two of the police officers knocked on the door of room nine and announced their presence. After some delay and the sound of shuffling from inside, the door opened and a woman walked out. According to police testimony, she was fully clothed and did not appear disheveled or frightened. She walked past the officers and neither of them questioned her. Through the half-open door police observed Defendant behind the door. They ordered him to come from behind the door with his hands in view. He complied.

The police then reholstered their weapons and entered the room. One officer asked Defendant if he had a gun and he replied in the negative. Another officer observed an empty holster protruding from a backpack on the bed. Defendant told the police he did not want them in his room. When he tried to walk toward the door one officer restrained him in a wrist control hold.[1] Meanwhile, the others searched the room. No one frisked Defendant, nor did anyone question him about the woman's presence in the room.

The police found a gun under the mattress and drugs in another backpack in the room.[2] Defendant was then placed

---

[1] A wrist control hold was described by one officer as a "hold where you brace the upper part of a person's arm against your own body and bend the wrist upward." It is used to restrain a person by applying pressure to the wrist.

[2] These drugs were suppressed prior to trial and are not an issue in this case.

under arrest.[3] A search of Defendant's person incident to the arrest uncovered drugs in a cigarette package in Defendant's pocket. Sometime after the arrest police learned that Defendant was a former felon.

We are concerned here with the validity of two searches and two seizures, that of the motel room which disclosed the gun, and that of Defendant's person which uncovered drugs. The state presents arguments to justify each search. The state relies on *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968); *Adams v. Williams,* 407 US 143, 92 S Ct 1921, 32 L Ed 2d 612 (1972); and *State v. Riley,* 240 Or 521, 402 P2d 741 (1965), for the proposition that any reasonable action undertaken to ensure the safety of the investigating officers is constitutionally permissible. The search of Defendant's person occurred, according to the state, as an incident to a lawful arrest. In the state's view, it is immaterial that probable cause did not arise until after the arrest because the search incident to arrest was "reasonably contemporaneous" with the development of probable cause to arrest.

The trial court denied Defendant's motion to suppress these items based on a conclusion that the police officers were faced with an emergency and had a right to "neutralize" the scene in order to continue their investigation. Defendant argues that both searches were unreasonable in that the police, prior to their entry into the motel room, had neither probable cause to believe that he had committed a crime nor exigent circumstances to justify the entry. Defendant relies on both the Fourth Amendment to the United States Constitution and Article I, section 9, of the Oregon Constitution.[4] He also cites, for the first time in his petition to this court, Oregon's "stop and frisk" law, ORS 131.605 to 131.625, as governing both the authority for and the limitations on police detention of persons based only on a reasonable suspicion.

---

[3] Defendant was not told the charge for which he was arrested. On appeal, the state indicates that he was arrested for being an exconvict in possession of a firearm.

[4] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

In this case, as in most that reach the appellate courts, legal analysis of the officers' actions arises from the prosecution's use of evidence seized from Defendant to obtain his conviction. The state's response to the petition contends that whether the seizure of the evidence was lawful or unlawful on either statutory or constitutional grounds should not lead to its exclusion in Defendant's trial because an officer who reasonably fears for his or her safety will not be deterred thereby. As the application of the exclusionary rule is questioned in this and many other cases, we review the basis upon which unlawfully seized evidence has been held inadmissible in this state.

It is generally said that the rule excluding from criminal prosecutions evidence obtained by an illegal search or seizure originated in *Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914). That is not strictly accurate. State courts had so held before *Weeks.* In 1901, the Supreme Court of Vermont, for instance, held inadmissible in a larceny prosecution a letter seized from the defendant in the course of executing a warrant that authorized a search for stolen goods but did not cover the letter. *State v. Slamon,* 73 Vt 212, 50 A 1097 (1901). Two years later the Iowa Supreme Court ordered the exclusion of evidence that had been seized under an invalid search warrant. *State v. Sheridan,* 121 Ia 164, 96 NW 730 (1903). This was a minority view, *see* contrary holdings collected in 24 ALR 1408 (1923); and before those decisions Oregon had joined the majority in theory, *see State v. McDaniel,* 39 Or 161, 65 P 520 (1901), although the evidence in that case probably was validly seized.

The significance of these early cases denying the use of illegally seized evidence, however, lies in their reasons. " '[A] party to a suit can gain nothing by virtue of violence under the pretense of process, nor will a fraudulent or unlawful use of process be sanctioned by the courts,' " wrote the Iowa court. " 'In such cases parties will be restored to the rights and positions they possessed before they were deprived thereof by the fraud, violence, or abuse of legal process.' " 96 NW at 731 (quoting from *State v. Height,* 91 NW 935).

The court acknowledged prevailing caselaw that courts would not stop proceedings to inquire how evidence was

procured nor question evidence unlawfully taken by persons without color of official authority. But this could not allow the state to convict a man by evidence seized under an invalid warrant. "To so hold is to emasculate the constitutional guaranty, and deprive it of all beneficial force or effect in preventing unreasonable searches and seizures." 96 NW at 731.

Similarly, the Vermont court had distinguished between private and official illegality. The rule that a court would not inquire how a party procured evidence was subject to another rule, "that, when a party invokes the constitutional right of freedom from unlawful search and seizure, the court will take notice of the question and determine it." 50 A at 1098. Moreover, the seizure by official force of incriminating evidence from a defendant's possession in effect "compelled [defendant] to give evidence against himself," contrary to another guarantee of the Vermont Constitution. *Id* at 1099.

The antecedents cited for this pre-*Weeks* view of the relation between the guarantee against unlawful searches and seizures and its consequences in criminal trials were the Supreme Court's exposition of that functional relationship in *Boyd v. United States,* 116 US 616, 6 S Ct 524, 29 L Ed 746 (1886) and its famous predecessor *Entick v. Carrington,* 3 Burr 1742, 19 How St Tr 1001, 1029 (1765), which was the recognized source of the American guarantees. The same opinions were the basis for the Supreme Court's decision in *Weeks* against the government's use of such evidence. *See also People v. Marxhausen,* 204 Mich 559, 171 NW 557 (1919); Fraenkel, *Concerning Searches and Seizures,* 34 Harv L Rev 361 (1920). The reason stated in *Weeks* why the government could not convict a defendant by evidence which its officers had unlawfully seized was neither to penalize those officers nor to deter them or others in the future, but to effectuate the law in the pending case.

"If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great

principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land."

232 US at 393.

Following *Weeks,* this court expressed its approval of the reasoning of that opinion. *State v. Laundy,* 103 Or 443, 204 P 958, 206 P 290 (1922). The court acknowledged its earlier rulings that courts "ordinarily" would not inquire during a trial into the collateral issue of how evidence was secured, but it treated this as a question of the timing of the defendant's demand:

> "If, however, the accused does not know until the paper or other article is offered in evidence that it was obtained by an unlawful seizure, he is nevertheless entitled at that time to an order of the court directing a return of the property [citing *Weeks* and two later decisions]. This rule of practice sanctioned by the Supreme Court of the United States ought, *for the same reasons which recommended it to the court,* be adopted and followed by the courts of this state."

103 Or at 494 (emphasis added).[5] Those reasons, we note, are not identical with a concern with "judicial integrity" that also is expressed in some Supreme Court opinions.[6] The object of

---

[5] In *State v. McDaniel,* 115 Or 187, 231 P 965, 237 P 373 (1925), the court initially reaffirmed its acceptance of the *Weeks* rule in *Laundy* "for the same reasons"as stated in *Weeks,* and stating that the importance of this question "to every citizen of the state, justifies us to quote at length the 'reasons' of the Supreme Court decisions which this court has so explicitly adopted in the *Laundy* case." 115 Or at 204 (followed by extensive quotations from *Laundy* and *Weeks*). On rehearing, however, a majority of the court, three judges dissenting, concluded that the issue of suppression did not arise. Similarly, the court's statement in *Laundy* itself has sometimes been downplayed as dictum, because the *Laundy* court found no illegal seizure. *See, e.g., State v. Hoover,* 219 Or 288, 347 P2d 69 (1959). However, if the court in *Laundy* had not meant what it said, there would have been no reason to examine the legality of the seizure. The court has since taken it as established that *Laundy* adopted the *Weeks* rule in Oregon to effectuate Oregon Constitution, Article I, section 9. *See State v. Valentine/Darroch,* 264 Or 54, 68, 504 P2d 84, *cert den* 412 US 948 (1972).

The immediate point is not when Oregon first excluded illegally seized evidence, but that the premise which commended itself for doing so was to bar the government's use of its own invasions of the defendant's rights, as stated in *Weeks* and its predecessors.

[6] *See, e.g., Terry v. Ohio,* 392 US 1, 12-13, 88 S Ct 1868, 20 L Ed 2d 889 (1968); *Elkins v. United States,* 364 US 206, 222-23, 80 S Ct 1437, 4 L Ed 2d 1669 (1960); *Olmstead v. United States,* 277 US 438, 470, 48 S Ct 564, 72 L Ed 944 (1928) (Holmes, dissenting); *id.,* 277 US at 484 (Brandeis, dissenting); *Weeks, supra,* 232 US at 391-92, 394.

denying the government the fruits of its transgression against the person whose rights it has invaded is not to preserve the self-regard of judges but to preserve that person's rights to the same extent as if the government's officers had stayed within the law. By 1961, when *Mapp v. Ohio,* 367 US 643, 81 S Ct 1684, 6 L Ed 2d 1081 (1961) required exclusion in all states, 26 states had themselves adopted this view.[7]

In recent years, opinions of the United States Supreme Court have rephrased the reasons for excluding unlawfully seized evidence in terms of deterring such unlawful official conduct, over dissents that would maintain the original principle.[8] The shift poses difficulties for the "due process" premise of the federal rule, but that need not concern us here.[9] Every rule of law, of course, is intended to deter contrary conduct, and it is successful when it achieves that objective.[10] But, as we recently stated,

---

[7] *See Elkins v. United States,* 364 US 206, appx pp 224-32, 80 S Ct 1437, 4 L Ed 2d 1669 (1960). The states excluding evidence include: Alabama, Alaska, California, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, Missouri, Montana, North Carolina, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Washington, West Virginia, Wisconsin and Wyoming.

[8] *See, e.g., Stone v. Powell,* 428 US 465, 96 S Ct 3037, 49 L Ed 2d 1067 (1976); *United States v. Peltier,* 422 US 531, 95 S Ct 2313, 45 L Ed 2d 374 (1975); *United States v. Calandra,* 414 US 338, 94 S Ct 613, 38 L Ed 2d 561 (1974).

[9] It is not easy to explain how "due process" for the defendant actually on trial, the necessary premise of applying the federal rule to state trials under the Fourteenth Amendment, depends on the Supreme Court's estimate of its effectiveness in one or another context in affecting future police behavior. Such a "social engineering" view also implies that officials could defeat judicial adherence to the rule by declining to be deterred.

[10] This court sometimes has spoken of the "protective and prophylactic purpose of the exclusionary rule." *State v. Holt,* 291 Or 343, 630 P2d 854 (1981). Also, occasional opinions have indicated that the court might turn to such a rule for purposes of deterring future violations even when it did not deem suppression required simply to effectuate the right violated in the case before the court. *See State v. Newton,* 291 Or 788, 813, 636 P2d 393 (1981) (plurality opinion); *State v. Bishop,* 288 Or 349, 353, 605 P2d 642 (1980). If the main object, however, were to deter officers rather than to effectuate rights of the actual defendant that the officers have disregarded, then unlawfully obtained evidence would be suppressed for the sake of deterrence whether or not the unlawfulness invaded the defendant's personal rights, or whether a consent search resulted from the initial illegal search. We have taken the contrary view. *See State v. McMurphy,* 291 Or 782, 635 P2d 372 (1981); *State v. Holt,* 291 Or 343, 630 P2d 854 (1981); *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981).

For criticisms of the instrumentalist approach of the most recent Supreme Court opinions, *see, e.g.,* Schrock and Welsh, *Up From Calandra: The Exclusionary Rule as Constitutional Requirement,* 59 Minn L Rev 251 (1974); *Critique, On the Limitations*

"* * * the deterrent effect on future practices against others, though a desired consequence, is not the constitutional basis for respecting the rights of a defendant against whom the state proposes to use evidence already seized. In demanding a trial without such evidence, the defendant invokes rights personal to himself."

*State v. McMurphy,* 291 Or 782, 785, 635 P2d 372 (1981).[11]

■    Thus this court has looked, rather, to the character of the rule violated in the course of securing the evidence when deciding whether the rule implied a right not to be prosecuted upon evidence so secured. From the beginning this consequence has been most obvious to courts when officers purporting to execute a judicial warrant seized evidence not covered by warrant, *see State v. Slamon, supra,* or when the warrant was wrongfully obtained, *see State v. Sheridan, supra.* A modern example in this court is *State v. Jones,* 279 Or 55, 566 P2d 867 (1977), where a unanimous court suppressed evidence taken under a warrant which the issuing judge would have denied if he had been apprised of a prior court order, although the impropriety was not of constitutional magnitude. Perhaps courts in such cases have found the result obvious because judicial authority is involved and the state would not have the evidence if it had observed the bounds set by that authority. But the principle is the same in warrantless seizures, because an officer can seize nothing without a warrant that could not properly be seized with a warrant if a magistrate had been at the officer's elbow.

Our focus on the character of the violated rule is demonstrated in our other nonconstitutional holdings before and

---

*of Empirical Evaluations of the Exclusionary Rule: Comment, A Critique of the Spiotto Research and United States v. Calandra,* 69 NWU L Rev 740, 776 (1974).

[11] *See also* the dissenting opinion of three members of this court in *State v. Newton,* 291 Or 788, 825, 636 P2d 393 (1981):

"The state and federal constitutions do not make the individual person a mere instrument for judicial 'policy considerations,' to be protected when a court thinks this will usefully influence official conduct and not protected when a court thinks that it will not. They do not invite courts to manipulate due process for the individual only as a means to some other end."

For a recent discussion of the reasons for exclusions referring both to statutory and constitutional violations, *see State v. Warner,* 284 Or 147, 162-65, 585 P2d 681 (1978).

after *State v. Jones, supra.* In a sequence of cases beginning with *State v. Cortman,* 251 Or 566, 446 P2d 681 (1968), we have held that evidence seized under a warrant would not be suppressed because of the officers' failure to comply with the statutory requirement to identify themselves before forcing entry. ORS 133.290, ORS 133.235(6), 133.542(2); *see also State v. Bishop,* 288 Or 349, 605 P2d 642 (1980); *State v. Valentine/ Darroch,* 264 Or 54, 504 P2d 84, *cert den* 412 US 948 (1972). We observed in *Cortman* that the purpose of requiring officers to announce themselves before entry was "grounded in practical experience: a police officer entering a house must guard against the possibility that he might be mistaken for someone with no right to be there." 251 Or at 570. The purpose of the "knock and announce" rule, in other words, is the safety of the officers and others on the scene against violent consequences of a sudden, unexplained break-in; it is not to protect the privacy and the freedom of those within against an entry and arrest or search which the officers in fact were legally authorized to make. On similar reasoning, we declined to suppress evidence seized under a search warrant which a magistrate had endorsed for nighttime execution without adequate findings of need. *State v. Ness,* 294 Or 8, 653 P2d 548 (1982); *State v. Brock,* 294 Or 15, 653 P2d 543 (1982).[12] On the other hand, when the object of the statute is to define the authority of officers to seize or to search a person or property, as is true of ORS 131.605 to 131.625, the court has drawn the logical consequence and has given effect to the statute by denying the state the use of evidence that it would not have secured if its officer had respected the rights that the statute was designed to protect. *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977). This conclusion was not reached without consideration of whether that consequence was peculiarly correct only for constitutional violations.[13] There is, however, no intrinsic or logical difference between giving effect to a constitutional and a statutory right. Such a distinction would needlessly force every

---

[12] The same reason might also be said to explain the court's refusal to suppress statements taken from an arrested person after the law required that he or she be taken before a magistrate, if the statement was not otherwise induced by the unlawful detention. *See State v. Shipley,* 232 Or 354, 375 P2d 237 (1962).

[13] That view was expressed in *State v. Valentine/Darroch, supra, and see State v. Newton, supra,* 291 Or at 814 (concurring opinion).

defense challenge to the seizure of evidence into a constitutional mold in disregard of adequate state statutes. This is contrary to normal principles of adjudication, and would practically make the statutes a dead letter. The United States Supreme Court has suppressed evidence seized by federal officers without legal authority or in violation of statutes although not of the Fourth Amendment. *Colonnade Catering Corp. v. United States,* 397 US 72, 90 S Ct 774, 25 L Ed 2d 60 (1970); *Benanti v. United States,* 355 US 96, 78 S Ct 155, 2 L Ed 2d 126 (1957). Thus, when the Court of Appeals misconstrued *State v. Valdez, supra,* as requiring suppression of evidence only if the noncompliance with ORS 131.615 also was unconstitutional, we reaffirmed the contrary holding in a per curiam reversal. *State v. Fairley,* 282 Or 689, 580 P2d 179 (1978).

In summary, although not without some diversity of expression, the court since *State v. Laundy, supra,* has held to a principled view of the effect of an unlawful seizure of evidence. It has maintained the principle that those rules of law designed to protect citizens against unauthorized or illegal searches or seizures of their persons, property, or private effects are to be given effect by denying the state the use of evidence secured in violation of those rules against the persons whose rights were violated, or, in effect, by restoring the parties to their position as if the state's officers had remained within the limits of their authority.

Turning to the evidence seized in this case, we examine first the search of the motel room. We start with the proposition that warrantless entries and searches of premises are *per se* unreasonable unless falling within one of the few "specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States,* 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967); *State v. Peller,* 287 Or 255, 598 P2d 684 (1979); *State v. Matsen/Wilson,* 287 Or 581, 601 P2d 784 (1979). The state has the burden of showing that circumstances existing at the time of entry invoke one of these exceptions. *State v. Matsen/Wilson, supra.* Absent consent, a warrantless entry can be supported only by exigent circumstances, *i.e.,* where prompt responsive action by police officers is demanded. Such circumstances have been found, for example, to justify entry in the case of hot pursuit, *United States v. Santana,* 427 US 38, 96 S Ct 2406, 49 L Ed2d 300 (1976), the

destruction of evidence, *United States v. Kulcsar,* 586 F2d 1283 (8th Cir 1978), flight of a suspect, *Johnson v. United States,* 333 US 10, 68 S Ct 367, 92 L Ed 436 (1948), and where emergency aid was required by someone within, *United States v. Goldenstein,* 456 F2d 1006 (8th Cir 1972).

In our review we are bound by the trial court's determination of what actually happened. Our function is limited to determining whether legal principles were correctly applied. *See State v. Peller, supra.* The trial court did not find that the police officers had probable cause to believe that criminal activity was occurring *prior* to entering Defendant's motel room. Instead, the state argued and the court accepted, the emergency doctrine as the exigency which authorized the initial police entry.

The emergency doctrine was recognized by the Supreme Court in *Mincey v. Arizona,* 437 US 385, 392, 98 S Ct 2408, 57 L Ed 2d 290 (1978), when the Court stated:

> "* * * We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. * * *"

Although this court has not had occasion to apply the emergency doctrine, the Court of Appeals has relied on the doctrine to uphold warrantless entries in recent cases. *See State v. Jones,* 45 Or App 617, 608 P2d 1220 (1980); *State v. Frink,* 42 Or App 171, 600 P2d 456 (1979); *State v. Plant,* 28 Or App 771, 561 P2d 647 (1977). The linchpin in all the cases which rely upon the emergency doctrine to justify a warrantless entry is the urgent need to render aid and assistance within. For example, in *State v. Jones,* where a police officer entered the defendant's apartment in the early morning hours believing four young children had been left unattended, the Court of Appeals said:

> "The emergency doctrine is founded upon the actions of police officers which are considered reasonable under the circumstances that faced the officer at the time of entry. The element of reasonableness to enter the premises is supplied by the compelling need to assist persons in need. * * *"

45 Or App at 620.

In *State v. Combs,* 270 Ark 496, 606 SW2d 61 (1980), police responded to a call from a motel that a woman was being held at gunpoint in room 25. As the officers approached the room, three persons arguing outside went into the room and a female was overheard saying, "Let me go. Let me go." The Arkansas Supreme Court upheld the warrantless entry into the room by the officers based on the exigencies of the situation. The officers had, based on all the corroborative information, reasonable cause to believe that individuals therein were " 'in imminent danger of death or serious bodily harm.' "[14] 606 SW 2d at 64 (quoting Ark Rules of Criminal Procedure).

Another illustration is found in *State v. Plant, supra,* where police were summoned to a motel after the maid, entering defendant's room 40 minutes after checkout time, found defendant lying on the bed apparently unconscious. The Oregon Court of Appeals upheld the warrantless entry into defendant's room based on the officer's need to render whatever assistance might have been necessary. The court cited as "well-established" that:

> " '* * * [P]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance * * *.' *Root v. Gauper,* 438 F2d 361, 364 (8th Cir 1971)."

28 Or App at 773. *See also State v. Nichols,* 20 Wash App 462, 581 P2d 1371 (1978).

■ Here, the circumstances which originally led the police officers to the door of Defendant's motel room arguably fell within the scope of the emergency doctrine. Hearing from an excited man that his girlfriend was being held in a motel room by a man armed with an automatic pistol in his waistband, the police officers rightfully went to Defendant's door to investigate. But, after knocking on Defendant's door and *prior* to the time of the police officers' entry, the woman in whose aid the use of the doctrine might be justified, opened the door and

---

[14] The police entry in *State v. Combs, supra,* was actually sustained based on Rule 14.3(a) of the Arkansas Rules of Criminal Procedure, a codification of the emergency doctrine.

left the motel room. Thus, any "emergency" existing prior to her exit dissipated at the point she walked out the door.[15] The state cannot invoke the emergency doctrine to justify their *subsequent* entry into Defendant's motel room. *See generally,* Mascolo, The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment, 22 Buff L Rev 419 (1973).

The state, foreseeing this conclusion, argues for an unusual twist to the application of the emergency doctrine. Conceding that the emergency may have dissipated with the woman's exit, the state claims this warrantless entry nonetheless was reasonable because, after her exit, the officers were faced with circumstances which led them to perceive a significant threat to *their* personal safety. Asserting that the officers had reasonable suspicion,[16] if not a duty, to make a reasonable inquiry of Defendant and being informed of Defendant's previous possession of an automatic weapon, the state claims that the officers were entitled to enter the motel room to "neutralize" the area for their personal safety while questioning Defendant.

■■ Defendant argues that ORS 131.605 to 131.625[17] limits the scope of a police intrusion based only on a reasonable suspicion. This court analyzes the statutory issues applicable to a case before reaching constitutional ones. *State v. Thompson,* 294 Or 528, 659 P2d 383 (1983); *State v. Spada,* 286

---

[15] The state does not claim, nor do the facts provide any support, that the police officers had any reason to believe some *other* woman remained inside the motel room in need of assistance.

[16] Defendant has not challenged the state's contention that reasonable suspicion to believe he had committed a crime continued after the woman, the purported victim, left the room and walked away without police intervention. We assume for purposes of this case that the police had sufficient objective facts upon which to base a reasonable suspicion for an inquiry.

[17] ORS 131.605 to 131.625 was adopted by the 1973 Legislature as a codification of certain of the principles set out in *Terry v. Ohio, supra.* ORS 131.615 provides that:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

Or 305, 594 P2d 815 (1979); *State v. Scurlock,* 286 Or 277, 593 P2d 1159 (1979). These provisions authorize a police officer to, in the statutory language, "stop" a suspect where the officer "reasonably suspects" that a crime has been committed when the officers are *"lawfully present* in any place." ORS 131.605(5); ORS 131.615 (Emphasis added.) The provisions do not give independent authority to the police to enter private premises to effectuate a "stop." A statutory definition of what constitutes "lawfully present" is not provided. Therefore, without deciding whether these provisions apply and thus operate to limit the scope of the police officers' intrusion once a "stop" is made, we must first assess the entry within the parameters of the state and federal constitutions to determine whether the officers' presence was lawful.

The state cites *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968) in addition to *State v. Riley,* 240 Or 521, 402 P2d 741 (1965), and *State v. McGregor,* 57 Or App 78, 643 P2d 1315 (1982), for the extension of *Terry* to include searches of constitutionally protected areas, such as Defendant's motel room, during their authorized questioning.[18] *Terry* involved the permissible scope of police intrusion into constitutionally protected areas, where a police officer, making a limited investigation of a citizen, has reasonable suspicion that the citizen is armed. The scope of the intrusion is limited to a "pat down" of the outer clothing and, only upon feeling a likely weapon, reaching into the citizen's clothing to seize the item. This power to search without a warrant and without arrest stems solely from the need of the officer to protect himself or herself from harm during the permissible investigation.

The confrontation in *Terry,* unlike the confrontation here, occurred on a public street. We have been directed to numerous cases which have extended the scope of *Terry* beyond the person to include searches of readily accessible, yet

---

[18] We begin our analysis with our own constitutional provision, Article I, section 9, as this state unquestionably remains free to impose greater restrictions on police activity than are required under federal constitutional standards. *See State v. Caraher,* 293 Or 741, 653 P2d 942 (1982). Should the laws of this state recognize and protect the Defendant's asserted right, it cannot then be argued that the state is depriving Defendant of the right in violation of federal law. Inasmuch as certain federal cases under the Fourth Amendment are instructive, we shall refer to federal cases in outlining our view of exigencies which apply equally under our own constitution.

constitutionally protected, areas for the protection of inter-rogating police officers. Each case involved a "stop" of a defen-dant on a public street while driving in an automobile. *See State v. Riley, supra,* (gun protruding from under front seat of automobile); *State v. McGregor, supra* (zippered gun case underneath automobile seat); *United States v. Rainone,* 586 F2d 1132 (7th Cir 1978) (protective search of readily accessible areas of automobile); *State v. Miller,* 45 Or App 407, 608 P2d 595, *rev den,* 289 Or 275 (1980) (seizure of baseball bat from automobile).

We note first that the Supreme Court distinguished early between the constitutional protections afforded a dwell-ing or other building and those afforded an automobile in tran-sit on a public street. *See Cardwell v. Lewis,* 417 US 583, 94 S Ct 2464, 41 L Ed 2d 325 (1974); *Chambers v. Maroney,* 399 US 42, 90 S Ct 1975, 26 L Ed 2d 419 (1970); *Husty v. United States,* 282 US 694, 51 S Ct 240, 75 L Ed 629 (1930); *Carroll v. United States,* 267 US 132, 45 S Ct 280, 69 L Ed 543 (1925). Second, we have been referred to no cases, nor has our independent research uncovered any cases, which extend the scope of a *Terry* protective search into the private recesses of one's dwell-ing when an officer stands at the threshold with merely rea-sonable suspicion to support an investigation.

We have considered the importance of police safety in many areas of search and seizure law. We have permitted war-rantless searches of the person incident to a lawful arrest in part to ensure the safety of the arresting officers. *See generally State v. Caraher,* 293 Or 741, 653 P2d 942 (1982). That same consideration justifies the search of the area immediately within an arrestee's ability to reach for a weapon. *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962). No better example is found than the power to frisk itself. *See* ORS 131.635. But, we have never held, and decline to hold here, that a reasonable suspicion sufficient to support a temporary detention of a cit-izen during investigation suffices to legalize entry into one's premises without probable cause, without a warrant, without exigent circumstances and over one's protests.

The state attempts to bootstrap the police officers' entry into Defendant's room by merging two independent doc-trines *i.e.,* the stop and frisk doctrine with the emergency doc-trine, in order to fill the gaps of one doctrine with the arguably

permissible scope of another. Thus, their "emergency" or exigent circumstance, is, in their words, the need to "neutralize" the area for their own protection while carrying on the questioning. We decline the invitation to stretch either of these doctrines in order to justify the police officers' actions based on the facts presented here. Such a modification or blending of the two doctrines would create an exception to the warrant requirement which would effectively swallow the rule.

■ The very purpose of our constitutional provision was to protect a person's home from governmental intrusions. *State v. Chinn, supra.* This right against intrusion should be stringently protected by the courts. *See e.g., Warden v. Hayden,* 387 US 294, 304, 87 S Ct 1642, 18 L Ed 2d 782 (1967), construing the similar provision of the federal constitution. As such, any exceptions to the warrant requirement should be narrowly and carefully drawn. *See Jones v. United States,* 357 US 493, 499, 78 S Ct 1253, 2 L Ed 2d 1514 (1958). The state's proposed rule that police officers, having authority to encounter a defendant and make reasonable inquiry, are thereby entitled to enter a defendant's premises in order to serve the needs of their safety, would be contrary to this principle of carefully drawn exceptions.

■ We are mindful of the dangers inherent in the work of police officers. The potential for violence exists in all confrontations between police and private citizens. But a remote possibility of harm to the police officers cannot justify a warrantless entry into the private recesses of one's house. Absent articulable facts that evidence a compelling and urgent need for the entry, the Oregon Constitution demands a warrant be issued. We can require no less where the entry, as here, is supported with less than probable cause.

■ Having determined that the entry was unlawful, we need not address the subsequent searches and seizures as they are the direct consequence of the unlawful entry. The discovery and seizure of the gun must be suppressed. Products of the search incident to the arrest must likewise be suppressed, as any probable cause for the arrest stems solely from the illegal entry and subsequent illegal search. *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966).

The decisions of the trial court and the Court of Appeals are reversed.

**ROBERTS, J.,** concurring.

I concur in the majority opinion but feel compelled to reply to the dissenting opinion. The dissent proposes a scheme whereby the officers could enter the premises of defendant and seize the gun lawfully. I am mindful of the dangers encountered regularly by police officers; however, the result reached by the dissent, though devoutly to be wished, is impossible of achievement under the dissent's analysis.

The dissent would have us believe that all that is required in this admittedly difficult fact situation is an application of *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968) and a grafting thereon of *Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969) in order to get the officers over the threshold into the motel room and then permit a search of the premises. It is not so easy as the dissent suggests.

In relying on *Terry* the dissent totally ignores the fact that *Terry* has been codified in Oregon. The dissent may have chosen to ignore that fact because the statute specifically prescribes the parameters of police action in stop and frisk situations.

ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry."

ORS 131.605(5) defines a stop:

"A 'stop' is a temporary restraint of a person's liberty by a peace officer lawfully present in any place."

ORS 131.625(1) provides:

"A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present."

ORS 131.605(2) defines a frisk:

"A 'frisk' is an external patting of a person's outer clothing."

Under the statute the officer's lawful presence is a prerequisite to a valid stop. Further, the authority to frisk is derivative of a lawful exercise of the stopping authority. If a stop and frisk analysis is to be used as the dissent suggests, it must resolve at the outset when and where the stop occurred, because the officers' lawful presence at the scene of the stop is a prerequisite to the validity of any subsequent frisk.

Both physical restraint and show of force are seizures of the person for constitutional purposes. *Terry, supra,* 392 US at 19 n. 16; *State v. Warner,* 284 Or 147, 161-62, 585 P2d 681 (1978). Both were used in this case. If the stop occurred when the police, while still outside, commanded defendant to come into view, the stop may be upheld because the officer's presence outside the room is lawful. On the other hand if the stop took place after the police entered and physically restrained defendant in a wrist control hold the warrantless, nonconsensual entry must be independently justified.

It may be that the police had sufficient grounds to stop and question defendant, an assertion by the state which defendant does not challenge. Had this confrontation occurred on a public street, the locus of *Terry,* a challenge to a stop supported by the requisite reasonable suspicion could not be sustained. Here the investigation took the police to defendant's threshold and the confrontation ensued through defendant's partially open doorway. If the stop occurred at this initial confrontation when the police ordered defendant out from behind the door and he, in response to their threat of force and show of authority, complied, it could be concluded that the stop was valid because it was made from a place where the officers were lawfully present.

Neither the stopping provision nor the frisking provision can be read to confer authority to make nonconsensual, warrantless entries into constitutionally protected areas. The dissent argues nonetheless that the search of defendant's motel room was a permissible extension of a frisk because it was reasonably necessary for the protection of the officers

both during the detention and during their departure from the area. This is the state's position as well, bolstered by its contention that the search did not contravene the stop and frisk statute because that statute is merely permissive; by authorizing a patdown search of a person it does not necessarily prohibit a more intensive search which is otherwise reasonable. This same argument was raised and rejected in *State v. Fairley,* 33 Or App 271, 576 P2d 38, *rev'd on other grounds* 282 Or 689, 580 P2d 179 (1978). The Court of Appeals wrote:

"Although the stop and frisk legislation originated as an attempt to codify the principles of *Terry v. Ohio, supra,* the provisions as enacted clearly depart from the standards set forth in that case. * * * With regard to the scope of the frisk allowed following a stop, the statute also departs materially from *Terry.* ORS 131.605(2) is not couched in broadly permissive terms. It defines 'frisk' as 'an external patting of a person's outer clothing.' The state argues that ORS 131.605(2) should be qualified by reading it as if it said, 'A frisk is an external patting of a person's outer clothing or some other type of limited intrusion if it is more reasonable under the circumstances.' The state concedes that the legislative history of ORS 131.605(2) is conflicting and does not support its position. This is a case squarely within the ambit of the express words used in the statute, and we are compelled to hold that the officer was not authorized to reach into defendant's pocket." (Footnotes omitted.) 33 Or App at 277.

Legislative history reveals examination of the statute's effect on the traditionally judicially controlled terrain of search and seizure law. Opponents of the legislature's attempt to codify the law of stop and frisk testified that "[t]here is little reason that the law should be frozen in its present state * * *. The courts should be left free to either continue in a status quo or modify the rules they have made." Testimony of Keith Kinsman, Deputy District Attorney before the Senate Judiciary Committee, Jan. 29, 1973, Exhibit F at 19. Other opponents argued that:

"[a]s a matter of social policy, I do not think it is wise to restrict the investigative power of the police to any greater degree than is necessary to insure constitutional rights to individuals. Therefore, whether or not a police officer has acted within his authority should be decided in a case by case situation on the basis of whether his actions violated individual

constitutional liberties." Testimony of Philip Roberts, representing the Oregon District Attorney's Association, *Id.,* Exhibit C at 11.

It is further significant that ORS 131.605 to 131.625 did not adopt wholesale the caselaw it codifies. *State v. Valdez,* 277 Or at 621, 625, 561 P2d 1006 (1977). The foregoing indicates that legislators were apprised of the limits codification would impose on authority to stop and frisk. Enactment of the statute demonstrates an intent to define independently of the judiciary the investigative authority of the police and to prevent modification of the law through later judicial decisions, a fact the dissent has chosen to ignore.

It is my conclusion that our statute must be applied on its terms and provides the beginning point for an analysis of any stop and frisk situation. It has simply superseded *Terry.* Our statute contains no language authorizing full searches of the person or beyond, nor does it provide for alternative measures, reasonable or otherwise. Rather, the statute confines a reasonable search to an external patting of outer clothing of a lawfully stopped person. It represents a legislative determination that such a limitation strikes the appropriate balance between protection of police officers and preservation of citizens' rights to be free from unreasonable searches or seizures in the sensitive sphere of confrontations between police and citizens initiated on less than probable cause. This court has recognized that species of searches or seizures not expressly authorized by law may be constitutionally permissible. *State v. Tourtillott,* 289 Or 845, 618 P2d 423 (1980), *cert denied* 451 US 972, 101 S Ct 2051, 68 L Ed 2d 352 (1981), However, where a law exists authorizing a particular search or seizure, and that law is itself constitutional, our task is limited to assessing the legality of police conduct on those terms. And when an officer's act exceeds his or her statutory authority we have no occasion to consider whether such conduct conformed with state or federal constitutional requirements. *State v. Valdez, supra,* 277 Or at 629; *State v. Greene,* 285 Or 337, 347, 591 P2d 1362 (1979) (Linde, J. specially concurring). In this case, I believe the entry into and search of the room exceeded the permissible scope of a stop and frisk under the statute. The dissent should not pretend the statute does not exist in order to reach the result it wants.

I concur with the majority.

**PETERSON, J.,** dissenting in part; concurring in part.

The majority holds the search unlawful, stating that "we have been referred to no cases, nor has our independent research uncovered any cases, which extend the scope of a *Terry* [*Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968)] protective search into the private recesses of one's dwelling when an officer stands at the threshold with merely reasonable suspicion to support an interrogation." I dissent because incident to the lawful stop of a suspect, circumstances may exist which authorize police to enter a home to search an area within reach of a suspect.

## THE TRIAL COURT FINDINGS AND CONCLUSIONS

After the hearing on the motion to suppress, the trial judge made careful findings of fact and conclusions of law. Each finding is supported by substantial evidence:

### "FINDINGS OF FACT

"1.   The police were dispatched to 4737 North Interstate, Portland, Oregon, on a call regarding an altercation with a possible gun involved.

"2.   Upon arriving at 4737 North Interstate, the police were met by citizen, Kevin Allen, who appeared to be excited and reported that his girl friend was in Motel Room No. 9 with the defendant. That he had observed the defendant in possession of an automatic pistol and that he believed his girl friend was possibly being raped at that time.

"3.   The police knocked at the door of Room No. 9 and received no response but could hear movement within the room. The police knocked again and announced their identity.

"4.   A woman, Katherine Wambolt, opened the door and exited Room No. 9 quickly.

"5.   The police were able to observe the defendant behind the partially-opened door. The defendant was ordered to come from behind the door showing his hands. The defendant complied.

"6.   The defendant denied possession of a gun and objected to the officers' presence in the room. The officers placed a wrist-hold on the defendant.

"7.   The police observed in plain view, protruding from a knapsack on the bed nearest the door, an empty handgun holster. The officers searched the knapsack.

"8.   The officers searched a second knapsack which was located immediately adjacent to the door of the motel room and where defendant had been standing when the police entered the room. Drugs were found.

"9.   A loaded automatic pistol was found under the mattress of the bed nearest the door, *within three feet of the defendant.* [Emphasis added.]

"* * * * *.

## "CONCLUSIONS OF LAW

"* * * * *.

"2.   The officers were faced with an emergency and had an obligation to investigate Mr. Allen's allegations of a possible rape in progress and possession of a weapon. * * *.

"3.   The officers had a right to ascertain the location of the weapon and neutralize the weapon prior to continuing their investigation. * * *.

"4.   The empty holster gave the officers probable cause to search that area of the room for a weapon for their own protection.

"5.   The officers had the right to seize the gun.

"* * * * *."

## THE SEARCH FOR THE GUN WAS VALID UNDER THE FOURTH AMENDMENT AND ARTICLE I, SECTION 9, OF THE OREGON CONSTITUTION

We all agree that law enforcement officers, in discharging their law enforcement duties, can and should take reasonable measures to protect themselves and others from harm by persons detained on suspicion of a crime. The key word in that proposition is "reasonable." It would not be reasonable to search an overparked motorist's car for a gun incident to the issuance of a parking ticket. On the other hand, it

might be a dereliction of duty for a police officer to fail to frisk one suspected of having held up a bank using an automatic pistol. It would be reasonable to search not only the suspect; it would also be reasonable to search the area within the suspect's reach, as well, if the suspect denies having a gun and there exists reasonable suspicion that the defendant has a gun.

The police had probable cause before entering the room to believe that the defendant was in possession of an automatic pistol. The police also had reason to suspect that a rape or kidnapping may have occurred.

The majority ignores significant facts: The police had reason to fear for their own safety because the defendant might use the gun to escape or harm the policemen or others.[1] The police did not know the suspect. They did not know what measures he might take to escape. The defendant denied having a gun. They had reason to be concerned about the gun. The police officers, in entering the room, seizing the defendant, and searching for the gun, were faced with a situation which reasonably led them to perceive a significant threat to their safety and possibly a threat to the safety of others. On that basis, they were entitled to take reasonable action to avoid or minimize that risk. One reasonable alternative was to enter and search the area near the defendant in order to discover the gun.

Both the state and federal constitutions use the term "unreasonable" searches or seizures. The risks facing police should be considered in determining whether the search or seizure is "unreasonable." The rule should be: If an officer has reasonable suspicion that a suspect is engaged in criminal activity, and has reasonable suspicion that the suspect is armed, and if the situation creates a perception that a significant threat to the safety of the officer or others exists, the officer may detain the suspect for a limited period of time for questioning and may conduct a patdown of the outer clothing and may search areas within reach of the suspect.[2]

---

[1] One of the policemen testified:

"* * * We felt that there was a strong possibility that a crime had been committed or was about to be, and when we went into the room, one of my main concerns was to locate the weapon so that we could render it useless so that nobody could — would be hurt by it ourselves or anyone else."

[2] The Court of Appeals in a related context wrote:

My analysis begins with *Terry v. Ohio, supra.* The opinion states:

"\* \* \* [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 392 US at 24.

The court concluded:

"Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. \* \* \* And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. \* \* \*." 392 US at 27.

---

"\* \* \* The officer's basis for entering the residence is not based on probable cause to believe a crime has been or is being committed; consequently, a probable cause analysis is irrelevant in determining if the entry was permissible. The inquiry is whether the facts available to the officer would lead a prudent and reasonable officer to see a need for immediate action to protect life or property. *Wayne v. United States,* 318 F2d 205 (DC Cir 1963). When faced with what he reasonably and in good faith believes to be an emergency, an officer's action should not be reviewed with severe judicial scrutiny in light of a hindsight analysis of the evidence. Even if the officer's conclusion that an emergency situation existed is ultimately determined to be erroneous, his actions should be upheld if the circumstances, as they appeared at the time of entry, would lead a prudent and reasonable officer to conclude immediate action was necessary. An officer facing a perceived emergency must make a hasty decision. He is not afforded the luxury of calm detached deliberation as are the judges reviewing his conduct." *State v. Jones,* 45 Or App 617, 620-21, 608 P2d 1220 (1980).

*Terry* was followed by *Adams v. Williams,* 407 US 143, 92 S Ct 1921, 32 L Ed 2d 612 (1972). There, an officer was alone on car patrol duty in a high-crime area when a citizen approached and informed him that an individual seated in a nearby car was carrying narcotics and had a gun in his waist. After calling for assistance, the officer approached the car to investigate the citizen's report. He tapped on the car window and asked the suspect to open the door. Instead, the suspect rolled down the window. The officer reached into the car and removed a fully loaded revolver from the suspect's waistband. That gun had not been visible to the officer from outside the car, but was precisely where the citizen's report had indicated it would be. The officer then placed the suspect under arrest.

After holding that the citizen's tip afforded the officer reasonable suspicion justifying further investigation, the court held that the officer's actions were lawful, stating:

> "The Court recognized in Terry that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. 'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons. 392 US, at 24 * * *. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose. Id., at 30, 20 L Ed 2d at 911.

> "* * * * *.

> "* * * Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable. The loaded gun seized as a result of this intrusion was therefore admissible at Williams' trial. * * *." 407 US at 146, 147-48. (Footnote omitted.)

*Pennsylvania v. Mimms,* 434 US 106, 98 S Ct 330, 54 L Ed 2d 331 (1977), involved a stop of an automobile for expired license plates and a later patdown search of the driver who had a large bulge under his jacket. This statement concerning hazards to investigating officers is pertinent:

"We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' Terry v. Ohio, supra, at 23, 20 L Ed 2d 889, 88 S Ct 1868, 44 Ohio Ops 2d 383. And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. 'According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation. 54 J. Crim LC & PS 93 (1963).—' Adams v Williams, 407 US 143, 148 n 3, 32 L Ed 2d 612, 92 S Ct 1921 (1972). We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. United States v. Robinson, 414 US 218, 234, 38 L Ed 2d 427, 94 S Ct 467, 66 Ohio Ops 2d 202 (1973). Indeed, it appears 'that a significant percentage of murders of police officers occurs when the officers are making traffic stops.' * * *" 434 US at 110.

*See also Warden v. Hayden,* 387 US 294, 298-99, 87 S Ct 1642, 18 L Ed 2d 782 (1967).

Other courts have reached similar conclusions. In *United States v. McClinnhan,* 660 F2d 500 (DC Cir 1981), police received an anonymous phone tip reporting a man carrying a sawed-off shotgun concealed in a black briefcase. Less than one minute later they arrived at the scene and observed a man, fitting the description, standing less than one foot from a black briefcase. One officer seized the briefcase, walked two to three feet away, opened it, and found a loaded sawed-off shotgun. They then arrested the defendant. After upholding the stop, the court ruled that the seizure and search of the briefcase for the sawed-off shotgun were lawful. The court observed that "the immediate protection of the investigating officers from possible assault, or the broader danger to the community of permitting one assertedly possessed of a sawed-off shotgun

to proceed on his way unhindered," satisfied the doctrine of exigent circumstances justifying an exception to the warrant requirement. 660 F2d at 503. The court stated:

> " '[I]t takes little imagination' to suppose that, following or in the course of Officer Bryant's patdown of appellant, the latter might well have gone for the weapon at his feet, resulting at the least in a dangerous scuffle for access to the weapon. For all practical considerations, Officer Bement's action in seizing the briefcase simultaneously and gaining control himself of the sawed-off shotgun can be legitimately regarded as a part of the total *Terry* weapons search justified in these particular circumstances." 660 F2d at 504.

No safe alternative to the seizure and search of the briefcase existed. The court summarily rejected the suggestion that the officers could have done nothing, noting that that was "a course whose risks are obvious." *Id.* Asking the defendant to open his briefcase was unsatisfactory, because "had he refused, they would have been no better off than before." *Id.* Nor was separating the defendant from his briefcase adequate; that measure "would obviate the danger only for the length of the stop; at some point they would be compelled to return the briefcase to appellant and thus place themselves in the danger they sought to avoid." *Id.*

Finally, the court rejected the defendant's suggestion that the police should have seized the briefcase and later obtained a warrant for its search. First, citing *Chambers v. Maroney,* 399 US 42, 90 S Ct 1975, 26 L Ed 2d 419 (1970), the court found that the seizure would not necessarily have been less intrusive than an immediate search. Second, the court branded as "speculative" the notion that the officers could have obtained a warrant to search the briefcase on the basis of a partially corroborated anonymous tip. *Id.* at 505. *But see Illinois v. Gates,* 103 S Ct 2317, 75 L Ed 2d 527 (1983). Having failed to obtain a warrant, the officers would be forced to return the briefcase, "leading to a recrudescence of the original danger." *Id.* The court emphasized that its holding was limited to a warrantless search for "an immediately-accessible dangerous weapon." *Id.*

Recently, *United States v. McClinnhan* was followed in *People v. Lambert,* 84 AD2d 849, 444 NYS2d 168, 170 (1981).

*See also United States v. Johnson,* 637 F2d 532 (8th Cir 1980); *United States v. Wilkerson,* 598 F2d 621, 625 (DC Cir 1978).

I concede that none of the cited cases involved entry of premises. Each case involved an on-the-street detention and search. I am mindful that one's expectation of privacy in one's home (I treat the motel room as the defendant's home) is greater than on the street or in the car. I grant that the police had neither probable cause to arrest nor probable cause to believe that defendant had committed a crime.

In most of the cases discussed above there existed neither probable cause to arrest nor probable cause to believe that a crime had been committed. In each case the search was upheld, however, because there existed another dynamic dangerous factor—a need to search to protect the police officers on the spot. That is the factor which I find present here. The majority does not.

I, too, am troubled by the entry into the home. But once the crucial factor exists—a need to search for the protection of the police—I would not forbid police to do what they did here, for the risk to the police is the same, on whichever side of the threshold defendant is standing.

Apparently the majority would require the police politely to stand outside the threshold and invite the defendant to come outside to talk before immediate action is taken to avoid risk of potential harm to themselves and others from an automatic handgun. As viewed from the detached solitude of a judge's chambers, inviting the defendant outside may have been a preferable alternative. But that is all it is—a reasonable alternative. True, we have an obligation to see that the rights of a defendant are protected. But the life and safety of police and others also weigh in the balance.

The defendant concedes that "the police had reasonable suspicion to detain and question the defendant, and possibly had reason to believe that he might be armed with a deadly weapon." The defendant argues that "the proper procedure would have been to perform a frisk, outside his motel room if necessary." The police had a right to frisk the defendant. In my opinion, they had a right to cross the threshold to perform a frisk and search areas within reach of the defendant.

If the defendant refuses to come outside to be frisked, must the officers turn and leave? Allen had reported that defendant was armed with an automatic pistol. A woman had left the defendant's room hurriedly, which led one of the officers to believe that she "definitely wanted out of the room." This fact tended to corroborate Allen's statement that his girlfriend was being held in the room against her will.

That the defendant had not been arrested when the search was made is not material to the analysis. Persons not arrested may present as great a danger to police and others as an arrested person, for the risk of a suspect grabbing for a weapon may be a factor in both cases, particularly where the defendant denies the existence of a weapon and the police have reason to fear that the defendant has one. This statement from *Chimel v. California,* 395 US 752, 763, 89 S Ct 2034, 23 L Ed 2d 685, 694 (1969), although made in a case involving a search incident to arrest, is in point:

> "* * * When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." 395 US at 762-63.

*See also Williams v. State,* 19 Md App 204, 310 A2d 593, 599 (1973); 3 W. LaFave, Search and Seizure 134-35, § 9.4 (1978). Granted, once officers determine that the suspicion which led to the initial entry is without substance, the officers must depart rather than explore the premises further. I do not agree with the majority that "any 'emergency' existing prior to [the woman's] exit dissipated at the point she walked out of the

door." This was not a potentially unsafe situation of the officers' own making. It was a dangerous situation, occasioned by the conduct of the defendant, requiring immediate appropriate action. Initially, the emergency here was concern for a possible rape victim. Upon observation of the suspect a second emergency presented itself—the safety of the police officers. In an emergency, time may be critical to the health and welfare of the victim, the officer, and others. It is this unique quality of an exigency that justifies, and sometimes requires, prompt and immediate responsive conduct on the part of the police in order effectively to counteract the dangers inherent in any exigent situation. In this posture, exigent circumstances take precedence over the warrant requirement.

I recognize that no search can be justified by hindsight, but as the police stood in the doorway of the motel room they were being confronted by at least two possible felonies in progress. The fact that they did not know that one of the felonies in progress was an ex-convict in possession of a firearm in no way diminishes the fact that the *suspect* knew he was committing a felony in progress and that the police were in his doorway. The police initially were unaware that the suspect was an ex-convict, and this cannot justify their entry into the room. Entry must stand or fall on the reported rape and succeeding events. But these facts illustrate the type of situations that the police can be confronted with. The danger was not "remote."

This result is not only a reasonable extension of *Terry;* it is necessary to achieve the goal stated in *Terry*— police safety. The police officers were authorized to frisk the defendant and search the area within reach of the defendant, and under the circumstances of this case, to cross the threshold to do so. Although the question is a close one, I would uphold the search for the gun.

I also disassociate myself from the exclusionary rule discussion on pages 230-37 of the majority opinion. The basis for the majority's holding is that the defendant's constitutional rights were violated. The evidence therefore should be excluded. The discussion and holding beginning on page 231 with *Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed

652 (1914), and ending on page 237 with *State v. Laundy,* 103 Or 443, 204 P 958, 206 P 290 (1922), is unnecessary. I agree that the drugs found on the defendant's person should be suppressed.

Campbell, J., joins in this opinion.