Argued and submitted November 25, 2015, reversed and remanded
November 30, 2016

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## AMY E. POTTER,
*Defendant-Appellant.*

Yamhill County Circuit Court
13CR01931; A157133

385 P3d 1105

Kristin A. Carveth, Deputy Public Defender, argued the cause for appellant. With her on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Nani Apo, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Peenesh H. Shah, Assistant Attorney General.

Before Ortega, Presiding Judge, and Lagesen, Judge, and De Muniz, Senior Judge.*

---

\* De Muniz, S. J., *vice* Nakamoto, J. pro tempore.

**DE MUNIZ, S. J.**

Defendant, who entered a conditional plea of guilty, ORS 135.335(3), for unlawful possession of methamphetamine, ORS 475.894, appeals the resulting judgment. On appeal, defendant assigns error to the trial court's denial of her motion to suppress methamphetamine that was seized during a warrantless search of defendant's bedroom. Defendant argues that the trial court erred in concluding that the search fell within the emergency aid exception to the warrant requirement of the state constitution because it was objectively reasonable for an officer to believe that the search of defendant's bedroom was necessary to alleviate a current medical emergency. For the reasons explained below, we agree with defendant and conclude that the trial court erred in denying her motion to suppress. We reverse and remand.

We are bound by the trial court's findings of fact if there is constitutionally sufficient evidence in the record to support them and we review the denial of defendant's motion to suppress for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id.* We state the facts below consistent with that standard.

Defendant's daughter reported initially to school officials and then to Deputy Mayer that she had found a suicide note from defendant earlier that morning. She reported that she tried but was unable to get a response from defendant by knocking on defendant's locked door. She was concerned that defendant had committed suicide or required urgent assistance.

Mayer and Deputy Trombla quickly proceeded to defendant's home in response to the report of the suicide note, as Mayer considered it to be an emergency. They arrived around 9:00 a.m. and found defendant sitting outside her home with her parents and friends. Trombla then, with Mayer present, radioed dispatch to cancel emergency medical services.

Mayer described defendant's demeanor as upset, angry, and disappointed, but she was conscious and able to clearly articulate her frustrations. Defendant told Mayer that she had taken one pill of Vicodin and one pill of Gabapentin (prescribed for a neck injury) the previous night in an attempt to kill herself, and that she was "not supposed to wake up." Defendant did not provide Mayer with a specific timeline, so Mayer did not know how long the prescription drugs had been in her system.

In an attempt to calm defendant, Mayer sat down next to her and talked "quite a bit about all the people that loved her." Defendant repeatedly told Mayer that she was not going to live any longer and that her kids were "better off without her." When asked whether defendant had seen a mental health professional, defendant replied that "nothing works."

While Mayer was speaking with defendant, Trombla stood in the driveway talking on the phone with a mental health emergency contact to keep them apprised of the situation. Mayer then walked over to the driveway because she wanted to be sure that Trombla informed the mental health contact that defendant was adamant about not living any longer and that Mayer felt that, if they "left her or didn't intervene, that [defendant] would kill herself that day."

As Mayer walked towards Trombla, defendant got up and walked toward the house. Mayer followed her because she "wanted to make sure that [defendant] didn't kill herself." Defendant walked into her bedroom while on the phone, slammed the door in Mayer's face, and locked it. Despite Mayer's repeated requests, defendant refused to unlock the door and stated that she wanted to talk privately on the phone to her sister. After waiting 30 seconds to one minute, Mayer kicked in the bedroom door.

Mayer saw defendant in her bedroom, "still talking on the phone or [with] a phone." Mayer did not see any evidence—pills, a glass of water, or defendant chewing or swallowing—that suggested that defendant had ingested pills while in the bedroom. When asked specifically whether Mayer saw a glass of water, Mayer said that she "didn't note that in the report, but [she] wasn't looking for that, either."

As Mayer entered the bedroom, defendant "lunged" into a nearby closet. Because Mayer did not know whether defendant was reaching for a weapon, she handcuffed defendant. Mayer testified that she did not arrest defendant, but detained her for her own safety because she was still concerned that defendant might try to kill herself.

Defendant was then escorted out of her bedroom and placed in Trombla's patrol vehicle for the purpose of transporting her to the nearest emergency room for evaluation and treatment. When asked if Mayer understood Trombla to be taking defendant for a mental health evaluation or a medical evaluation, Mayer responded, "[E]very time you go to the emergency room, you are seen by a medical doctor. They clear you and then they determine the mental health." Mayer did not see Trombla drive away, but Trombla testified that he drove defendant to the hospital without lights or sirens.

Before becoming a deputy, Mayer worked for six years as a certified emergency medical technician (EMT), and she still maintains her certification. As an EMT, she received training specific to drug overdoses and suicides and has responded to many cases of that nature. Mayer testified that, in overdose cases, it is "important for the doctors * * * to know what was taken, the quantity of what was taken, [and] the dosage of the pills" because "some medicines will amplify the affect and some will reduce it." She also testified that it is important to bring suspected drugs or medicine that the person ingested to the hospital as soon as possible so that "doctors * * * can evaluate what was taken." Mayer indicated that, in her experience as an EMT with overdose cases, she has seen people appear "coherent for quite a while, and then, instantly drop."

As Trombla transported defendant to the hospital, Mayer searched defendant's bedroom and bathroom to look for prescription pills. Mayer, in light of her training and experience with drug overdose cases, testified that her motivation for conducting the search was for defendant's well-being, to determine the type, quantity, and dosage of the prescriptions so that defendant could receive the "best care

when she arrived at the hospital." After finding nothing in the bathroom, Mayer entered defendant's bedroom and saw a prescription pill bottle of hydrocodone sticking out of a cosmetic case on the bed. Mayer also found a plastic sandwich bag of marijuana, a small bag of crystal-like powder, a glass pipe, and another prescription bottle without a label in the case. Mayer did not test anything she found at the scene because she "wanted to focus on * * * finding all the prescriptions, because [she] still hadn't found the Gabapentin, which [defendant] had admitted to tak[ing the night before]."

Mayer then found a basket of prescription pill bottles, most of which were Gabapentin, prescribed to defendant. Next to those bottles, Mayer discovered a hard case with a small baggy of methamphetamine inside. Mayer testified that she opened the hard case because, in her training and experience with drug overdose cases, people tend to admit to taking legal prescription drugs, but hardly ever admit to taking illegal drugs. As an EMT, Mayer was trained to look for illegal drugs that could enhance the effects of legal, prescription drugs. After finding the Gabapentin (the drug defendant admitted to having taken) and the hard case, Mayer stopped searching.

Immediately after concluding the search, Mayer called the emergency room, reported what she had found in the bedroom, transported the prescription drugs to the hospital, and took the methamphetamine to the sheriff's office. Defendant was later charged with one count of unlawful possession of methamphetamine, ORS 475.894. Below, the parties argued about whether the emergency aid exception to the warrant requirement of Article I, section 9, of the Oregon Constitution, applied to the warrantless search. The trial court agreed with the state that the exception applied, concluding that Mayer's search of defendant's home was justified because,

> "under the totality of the circumstances at the time she made the search, [she] could reasonably believe, and did believe, that a true emergency continued to exist and that, based on her training and experience, obtaining more information about the drugs ingested was important to [defendant's] medical treatment at the emergency room."

After the trial court denied defendant's motion to suppress, she entered a conditional guilty plea, reserving the right to appeal the denial.

Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" Warrantless entries and searches of premises are *per se* unreasonable under Article I, section 9, unless they fall within a recognized exception to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (citing *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967)). The state has the burden to prove that circumstances existing at the time were sufficient to satisfy an exception to the warrant requirement. *Id.* at 237. To justify a warrantless entry under the emergency aid exception, an officer must have an "objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011).

On appeal, the parties reprise the arguments they made below. Defendant argues that it was not objectively reasonable for Mayer to search her bedroom under the emergency aid exception because any imminent threat of harm to defendant had already dissipated. *See Davis*, 295 Or at 239-40. According to defendant, her failed suicide attempt the previous night was not sufficiently urgent to justify the warrantless search of her bedroom. Defendant asserts that, although she was upset and angry when deputies arrived at her home and continued to express suicidal wishes, she was lucid, coherent, and surrounded by family and friends. She contends that at no point did she show any signs that she was suffering from a "life-threatening overdose that required an immediate search for pills and drugs to alleviate."

The state responds by arguing that the warrantless search was "urgently necessary to assist in treating defendant for any potential drug overdose" and, thus, it was lawful under the emergency aid exception to the warrant requirement. The state contends that, although defendant

did not show any signs of mental compromise at the time of the search, her previous suicide attempt, her present suicidal ideations, and the fact that she was locked in her bedroom alone for up to one minute, support Mayer's objectively reasonable belief that the search was necessary to render emergency aid. The state also argues that, even if the initial emergency was over when the deputies arrived and found defendant talking to her friends and parents outside her home, defendant reintroduced the emergency when she locked herself in her bedroom after repeatedly expressing that she planned to kill herself in the very near future.

The state relies on *State v. McDonald*, 168 Or App 452, 7 P3d 617, *rev den*, 331 Or 193 (2000), in which we found that a drug overdose constituted an emergency justifying a warrantless search for the purpose of gathering information about the drugs the defendant had ingested, even though the defendant was conscious at the time of the search.[1] In *McDonald*, the defendant's mother placed a 9-1-1 call to report her son's possible drug overdose. *Id.* at 454. When police arrived, she explained that the defendant had been a heroin addict for many years and that he was unconscious at the time she made the 9-1-1 call, but that he may have regained consciousness. *Id.* The officer testified that, in his experience, heroin addicts use a so-called "hype kit," which consists of a spoon and a lighter or matches, to prepare the heroin for use. *Id.* The defendant was found conscious, sitting on a landing at the top of the stairs, and the officer then "noticed a swollen mark on [the] defendant's arm indicating a recent injection and that a needle and several burned matches, but no spoon, were lying on top of a desk located on the same landing as [the] defendant." *Id.* The defendant denied any drug use, claimed he was a diabetic, and appeared "hazy" and "uncooperative." *Id.* at 454-55. While the medical team spoke with the defendant, the officer searched the defendant's room, located about 10 to

---

[1] The state also relies on *State v. De Aubre*, 147 Or App 412, 937 P2d 125 (1997), which was decided before *State v. Baker*, 350 Or 641, 260 P3d 476 (2011). In *De Aubre*, we held that the search of the defendant's fanny pack subsequent to a suspected overdose was lawful under the emergency aid exception, but that search was predicated on the defendant's lack of knowledge about the tablet dosage of the Ativan pills. 147 Or App at 414-17.

12 feet away, and found a spoon with heroin residue on it under the corner of the defendant's mattress. *Id.* at 455. We held that the heroin was lawfully obtained under the emergency aid exception to the warrant requirement because "it was objectively reasonable for [the officer] to believe that his immediate assistance in determining the amount, variety, and combination of drugs taken by [the] defendant was required to avert a life threatening drug overdose." *Id.* at 459-60.

Defendant, on the other hand, argues that her case is distinguishable from *McDonald* and is most similar to *Davis*. In *Davis*, officers were approached by a man who said that his girlfriend might be being raped in a nearby hotel room. 295 Or at 229. The officers knocked on the door of the hotel room and, "[a]fter some delay and the sound of shuffling from inside, the door opened and a woman walked out." *Id.* The woman was "fully clothed and did not appear disheveled or frightened." *Id.* The officers then entered the hotel room—without questioning the defendant about the woman that had just left the room—and conducted a search, ultimately finding drugs and a firearm. *Id.* The Supreme Court held that the emergency aid exception did not apply because, before the search, the woman walked out of the hotel room, seemingly undisturbed; any emergency "dissipated at the point she walked out the door." *Id.* at 239-40.

We agree with defendant that this case is more akin to *Davis* than *McDonald*. Like *Davis*, the facts in this case do not support an objectively reasonable belief that the warrantless search was necessary. Here, the emergency associated with a drug overdose dissipated before Mayer's warrantless search of defendant's bedroom. When the deputies arrived, defendant was agitated due to her failed suicide attempt, but she was able to clearly articulate her emotions. Unlike *McDonald*, defendant was not hazy, incoherent, or demonstrating any other type of mental compromise that would indicate a recent drug overdose or the need for urgent medical care. Similar to *Davis*, the initial emergency dissipated once defendant walked out of her locked bedroom and outside her home prior to the deputies' arrival, without exhibiting any symptoms of a drug overdose.

We agree with the state, however, that the emergency was reintroduced when defendant locked herself in her bedroom for the second time while still expressing suicidal thoughts. That emergency, however, only existed until Mayer kicked down the door and observed defendant either on the phone or with a phone in her possession, without any pills or a glass of water nearby. At that point, the subsequent emergency had dissipated.

Mayer testified that, in her experience, people will often admit to taking prescription drugs, but will not admit to taking illegal drugs. Nevertheless, Mayer had no reason to believe that this specific defendant had taken illegal drugs aside from her general understanding of overdose cases. Mayer did not observe any illegal drugs near defendant at the time that she kicked down the door, she did not note any physical marks indicative of illegal drug use on defendant's person, nor did she indicate that defendant's mental abilities appeared to be compromised at any point during their interaction. Mayer also testified that it is "important for doctors *** to know" the type and quantity of drugs ingested, but there is no indication that defendant would not have been able to communicate that information to the doctors herself; throughout her entire encounter with the police, defendant was clearly able to communicate her frustrations regarding her suicide attempt and was seemingly forthright about what she had taken. Mayer's general understanding of overdose cases, coupled with her goal to ensure that defendant received the "best care" at the hospital, does not bring Mayer's search within the emergency aid exception to the warrant requirement. Mayer's observations, at the time of the search, did not support an objectively reasonable belief that the search was necessary to prevent defendant from imminently suffering from a drug overdose.

Thus, the search was unlawful because it did not fall within the emergency aid exception to the warrant requirement, and the trial court erred in denying defendant's motion to suppress the methamphetamine found during the search.

Reversed and remanded.